Docket No. 80106–Agenda 6–November 1996.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ARTHUR DALE HICKEY, Appellant.

Opinion filed September 18, 1997.

JUSTICE McMORROW delivered the opinion of the court:

Following a jury trial in the circuit court of Will County, the defendant, Arthur Dale Hickey, was convicted of first degree murder, attempted first degree murder, aggravated battery with a firearm, aggravated criminal sexual assault and home invasion. At a separate sentencing hearing, the same jury found defendant eligible for the death penalty. The jury also found that there were no mitigating circumstances sufficient to preclude imposition of that sentence. Defendant was sentenced to death for the murder and to concurrent 60-year terms of imprisonment for the remaining offenses. Defendant's death sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rs. 603, 609(a). For the reasons which follow, we affirm defendant's convictions and sentences.

Background

The defendant's convictions stem from the murder of Jeff Stephens and the sexual assault and attempted murder of his wife, Heather. At trial, Heather testified that in November 1991, she and her husband lived in a two-story farmhouse on Route 102 in the small town of Ritchie, Illinois. On the morning of November 25, 1991, between 5 and 5:30 a.m., Jeff got up to go to work. Heather remained in bed, awake. November 25 was a Monday, the day of the week that garbage was collected at the Stephens' home. Jeff went downstairs from the second-floor bedroom to take the garbage out to the end of the driveway for pickup. Shortly after Jeff had gone downstairs, Heather heard yelling and then a gunshot from outside the house, from an area near the driveway. Heather got up and looked out her bedroom window. However, she was unable to see what was happening because a portion of the house obstructed her view.

Heather went to put on her bathrobe, which hung on the back of the bedroom door. Before she had finished putting on her robe, a man wearing a ski mask and holding a gun appeared in the bedroom doorway. The man forced Heather onto the bed, where he tied her wrists to separate bedposts. The man then left the bedroom and Heather heard the sound of something being dragged into the house.

The man returned to the bedroom, removed his ski mask and all of his clothing except his shirt, and attempted to sexually assault Heather. No lights were on in the bedroom. A small nightlight in the hallway outside the bedroom shone down on the stairs. Also, because it was not yet dawn and the blinds to the windows were shut, no light entered the bedroom from outside the home.

Heather testified that the man had trouble as he attempted to engage in sexual intercourse. The man left the room and came back with a lotion which he put inside Heather. He then sexually assaulted Heather while kneeling on the bed. The man's face was two to three feet away from Heather, but because she was frightened, Heather tried not to look at him. Heather was nearsighted and wore glasses, but she was not wearing her glasses during the attack.

When the man finished assaulting Heather, he put his clothes on and asked her “where the money was.” He also asked her for the keys to the Stephens' red Plymouth Laser, which was parked outside in the driveway. Heather told the man that there was money on the bedroom dresser and that the keys to the Laser were in the pocket of Jeff's pants. The man took between thirty and forty dollars off the dresser and left. Heather then heard the Laser's car alarm go off. The man returned to the bedroom and asked Heather how to turn off the alarm. Heather told him how to do so. After shutting off the alarm, the man came back into the bedroom and told Heather to turn her head. The man then shot Heather in the side of her face.

Heather was unconscious for a short while. When she awoke, she saw that the ropes which had been used to tie her to the bed were gone. After hearing a car back out of the driveway, Heather went downstairs. She found Jeff lying at the foot of the stairs, unconscious. Jeff had been shot in the head. Heather tried to use the telephone but discovered that the line was dead. Heather then went to a neighbor's house to summon help. Shortly thereafter, the police and paramedics arrived.

Heather initially told police that her assailant was in his 20s, was between 5 feet and 5 feet 4 inches tall, weighed 130 pounds, had medium length, stringy blond hair, and had no facial hair. She also told police that she could identify her attacker if she saw him again. While Heather was at the hospital being treated for her injuries, she helped a police artist make a sketch of a subject based upon her description. Heather viewed photo lineups and mug books on many occasions during the 16-month period following the attack. Some of the photo lineups included photographs of defendant. However, Heather was never able to identify anyone as her assailant.

Testimony at trial established that in November 1991, defendant was 40 years old, was 5 feet 6 inches tall, had dark hair with some gray in it, and had a mustache. Further testimony established that in March 1992, defendant weighed between 180 and 190 pounds. On the witness stand, Heather testified that she felt she was no longer capable of identifying her assailant. She stated that she was not certain that her assailant had blond hair, and said that she could not recall if her assailant had any facial hair. She was certain, however, that the man who attacked her was taller than she was (she is 5 feet 3 inches tall). Heather explained that she no longer had confidence in her ability to identify her assailant because of the amount of time that had passed since she was attacked; the number of photo lineups she had been shown without obtaining any positive results; the darkness of her bedroom at the time of the attack; and the traumatic nature of the attack. When asked to identify defendant, Heather stated that she had not seen him before and that, to her knowledge, he had never been in her home.

The Stephens' Plymouth Laser was discovered in the parking lot of a Super Value grocery store in Wilmington, Illinois, at 7:51 a.m. on November 25, 1991. Wilmington is located approximately three miles north of Ritchie. Daniel Simenson, an evidence technician for the Will County sheriff's department, examined the Laser for evidence. He found a small section of purple and yellow nylon rope inside the car. He was unable to find any fingerprints on the car other than those belonging to Jeff or Heather Stephens.

Will County Deputy Sheriff Robert Persicketti examined the Stephens' home for evidence on November 25, 1991. He photographed and videotaped the home and a portion of the surrounding area. Inside the home he recovered several items, including a tooth and a bullet found in a bathroom, a .25-caliber shell casing found in Heather's bedroom, a pair of wire cutters, also found in Heather's bedroom, and a two-foot long section of nylon rope found in a hallway. He retrieved a hair from Heather's bed and secured the bedsheets. A United Parcel Service door tag with a bloody shoeprint on it was also found at the scene. Outside the home, in the area of the driveway, Persicketti found drag marks in the snow, a set of keys, a “Kool” brand cigarette butt, and another .25-caliber shell casing. Persicketti also observed that the telephone lines to the house had been cut. Persicketti attempted to recover fingerprints from various items in the home, including doors, the wire cutters, and jars and containers from the Stephens' bathroom. However, he was unable to recover any fingerprints which were suitable for analysis. Persicketti also photographed a shoeprint which was found in the snow by the Laser in the grocery store parking lot in Wilmington.

David Turngren, a forensic scientist at the Illinois State Police forensic science lab in Joliet, testified that he recovered approximately 200 hairs and hair fragments from a sheet taken off the Stephens' bed. Two pubic hairs recovered from the bedsheet did not match either of the victims' hairs. Of these two hairs, one was consistent with defendant's pubic hair standard. This meant only that defendant could not be excluded as the donor of that hair. Analysis of the other pubic hair was inconclusive. Turngren stated that an assistant State's Attorney withdrew a request that DNA analysis be performed on the hair that was consistent with defendant's standard.

Robert Hunton, a firearms expert, testified that the bullets which had killed Jeff and wounded Heather were fired from the same .25-caliber gun. The fired shell casings found in the Stephens' driveway and in Heather's bedroom were also fired by a single weapon.

Defendant's stepson, Mike Adermann, testified that he lived with defendant in Ritchie in November 1991. Adermann stated that defendant called him at home at about 6 a.m. on November 25, 1991, and asked to be picked up at the Shell gas station in Wilmington. The Shell station was located across the street from the grocery store parking lot where the Stephens' Plymouth Laser was discovered. Adermann stated that he picked up defendant at the gas station and then drove back to Ritchie. When the two returned to Ritchie they noticed police cars along Route 102. Defendant behaved normally when they saw the cars. Adermann testified that he dropped defendant off near the village hall in Ritchie, which was on Route 102 near the Stephens' home. As Adermann began to drive away, he looked back and saw what he believed to be defendant's van, parked near the village hall. Adermann then drove home. Shortly thereafter, defendant arrived home in his van.

Adermann further testified that defendant owned some handguns, and said that defendant might have kept a handgun in his van. Adermann also stated that he was not interviewed by police until April 20, 1993. During that interview, the police told Adermann that someone had phoned them and said that defendant was involved in the murder of Jeff Stephens. Adermann remembered the crime and subsequently told the police about the events which had occurred on the morning of November 25, 1991.

One of the Stephens' neighbors, Richard Findley, testified that he was getting ready to go to work at approximately 5:30 a.m. on the morning of the crimes, when he heard an argument take place outside his home. Findley heard someone say something like, “get back into the house” or “get back in there.” Findley left for work at approximately 5:55 a.m. When he left, it was “pitch black” outside. Findley stated that as he drove to work, he saw a black and white, two-tone van parked near the village hall, just off Route 102. On October 3, 1993, a police investigator interviewed Findley and showed him a picture of defendant's van. Findley did not think that the van he saw matched the picture of defendant's van because of the different shapes of the vans' front ends. The parties stipulated that defendant owned a silver and gray 1987 Ford Aerostar van.

Another neighbor of the Stephens, Judith Howell, a registered nurse, testified that Heather came over to her home at about 6:15 a.m. on November 25, 1991. Heather was visibly shaken, her face was bleeding and she was spitting out teeth. Heather told Howell that she needed to use the phone and asked Howell to come back to her house to help Jeff. While Howell's daughter phoned the police, Heather and Howell went back to the Stephens' house. When they reached Jeff, Howell saw that a portion of his skull had been blown away, that he was gurgling, and that his pulse was weak and thready. She concluded that there was nothing she could do for him. Howell stayed at the Stephens' house until the police and paramedics arrived. Howell testified that she smoked “Kool Mild” cigarettes but stated that she did not leave a cigarette butt on the Stephens' driveway.

Tamara Hansen testified that she was the office manager at a general contractor's business that employed defendant in November 1991. Hansen stated that defendant's last week of work was November 4 through November 10. She did not know if defendant had come to the business' premises on November 25, 1991, hoping to obtain work for the day.

Susan Coppage, a nurse, testified that blood samples and vaginal and rectal swabs were taken from Heather at the hospital where she was treated for her injuries on November 25, 1991. Subsequent testing confirmed the presence of semen on the swabs. Testing also confirmed the presence of semen on a pair of panties worn by Heather, and the presence of blood on a sweatshirt which Jeff was wearing when he was shot. Several witnesses testified in detail regarding the chain of custody of the blood samples, the swabs, the panties and the sweatshirt.

David Metzger, research coordinator of the Illinois State Police's DNA Research Development Laboratory, testified for the State regarding deoxyribonucleic acid (DNA) evidence. Metzger described generally the process of restriction fragment length polymorphism (RFLP) DNA profiling. Metzger explained that the first step in this process involves the extraction of the DNA from the various materials to be examined and compared. Typically, these materials include an evidence sample of blood or semen and a suspect's blood sample. A restriction enzyme is used to cut the samples of DNA into a large number of fragments of varying length. The fragments from the evidence DNA sample and the suspect's DNA sample, as well as other control samples, are then placed side-by-side into separate lanes in a gel and exposed to an electric current. The current causes the fragments to move through the gel, with the smaller fragments moving faster than the longer ones. When the current is stopped, the shorter fragments will have moved greater distances than the longer ones. The DNA fragments are then transferred from the gel to a stable nylon membrane. In the process, Metzger stated, the double-stranded DNA molecule is made single-stranded. Next, a commercially available DNA probe is made radioactive and washed over the membrane. The probe bonds to the single-stranded DNA samples at a specific target site or locus. The locus varies in length from person to person and, hence, varies in location on the membrane. The membrane is then washed and placed between two pieces of X-ray film. When the film is developed, bands will appear where the probe has bonded to the DNA fragments.

Metzger explained that the developed X-ray film is called an autoradiogram or autorad. The bands on the autorad produced by the evidence DNA and the suspect's DNA are compared to one another to see if they are located in the same place. This is done visually and with a computer imaging process. If the bands do not match (an exclusion), then the DNA samples did not come from the same source. If the bands match, further statistical analysis must be performed to determine the chances of the match being the result of coincidence rather than the result of the suspect's being the donor of the evidence sample.

Metzger testified that he was able to extract DNA from a stain card which contained Heather's blood, from semen found on certain of the vaginal and rectal swabs taken of her, from semen found on a swatch of her panties, and from a swatch of Jeff's sweatshirt which contained blood. Metzger then began analyzing the DNA using the RFLP process. However, the restriction enzyme which Metzger used was allowed to stay on the DNA too long and, as a result, no interpretable results were obtained. Metzger then performed another method of DNA analysis, polymerase chain reaction (PCR)
(footnote: 1), with these samples. This analysis excluded Jeff Stephens and several criminal suspects as donors of the evidence semen sample. After Metzger performed the PCR analysis, he photographed the strips which displayed the results. He then discarded the PCR strips because they could not be used for anything else and because the color of the strips, which establishes the results of the test, changes over time.

Metzger then requested further evidence samples. He received Heather's panties and additional vaginal swabs that had been taken of her, both of which contained suspect sperm. Metzger also received samples of defendant's blood. Metzger extracted DNA from the vaginal swabs, the panties, Jeff's sweatshirt, Heather's blood, and defendant's blood. Metzger exposed these DNA samples to nine different probes and developed nine autorads. In Metzger's opinion, the bands on the autorads from defendant's DNA matched the bands on the autorads from the evidence semen DNA.

Metzger explained that he used the procedure known as fixed-binning to determine the probability of a coincidental match. In this process, the bands which appear on an autorad are assigned to size classes, known as bins. A population database is then used to determine how frequently these bins occur in a population. Metzger stated that the database from which the State Police calculated population frequencies consisted of blood samples taken from about 400 Illinois Caucasians and 200 Illinois African-Americans. When a DNA sample is exposed to a number of different probes, and a number of different autorads are developed, the resulting bands on the autorads are collectively referred to as a DNA profile. Once the bin frequencies on individual autorads are determined, further calculations are performed to determine the frequency with which the DNA profile occurs in a population. Metzger discussed two methods of calculating the frequency with which a DNA profile occurs in a population: the product rule and the interim ceiling approach. Using the product rule of frequency calculations, Metzger believed that the probability that a person other than defendant, randomly selected from the population, would have the same DNA profile as that provided by the first five probes he used on the evidence semen sample, was 1 in 15 billion. Using eight of the nine probes, plus the PCR results, and the interim ceiling method of calculation, the random match probability was 1 in every 43 billion people. In Metzger's opinion, the DNA from the evidence semen sample originated from defendant.

Dr. Michael Conneally, distinguished professor of medical genetics and neurology at Indiana University Medical Center, also testified regarding the DNA evidence. Conneally was familiar with the State Police laboratory's procedures, or protocol, and its population database, both of which were similar to those established by the FBI. Conneally testified that the laboratory's protocol and its database were scientifically valid. Conneally also believed that the autorads produced by Metzger were of excellent quality. Conneally agreed with Metzger's random match calculation of 1 in 15 billion. Conneally stated that based on the nine probes and the PCR results, he had no doubt that the DNA from the evidence semen sample and the DNA from defendant were the same.

On cross-examination, Conneally testified that the State Police laboratory's use of the product rule to calculate profile frequencies was scientifically valid, and that there was no significant controversy in the scientific community regarding the use of that principle. Conneally acknowledged that DNA can degrade, and that degraded DNA can create false results. However, Conneally stated that there was no evidence of degradation of the DNA in this case and, further, that he would be able to detect any degradation based on his experience in interpreting autorads.

Dr. Randell Libby, a molecular geneticist, was the first witness for the defense. Libby noted that the National Research Council (NRC), a group of distinguished scientists operating under the auspices of the National Academy of Science, had issued a report in 1992 which recommended that forensic laboratories follow a number of quality assurance guidelines when performing DNA analysis. According to Libby, the State Police laboratory was operating in violation of these guidelines, in that they did not report laboratory error rates, did not properly conduct blind proficiency testing, and did not monitor the laboratory's level of reproducibility.

In this case, Libby believed that Metzger erred when he overexposed the initial DNA samples to the restriction enzyme and was thus unable to perform further RFLP analysis. According to Libby, Metzger also erred, under his laboratory's protocol, when he discarded the PCR typing strips which he developed for these initial samples. Libby noted that misuse of the restriction enzyme during the RFLP process can lead to extra bands or band shifting on autorads, which indicates that the final results may not be reliable. The use of monomorphic probes is a control against such band shifting. However, Libby stated that Metzger used only polymorphic probes. Libby was also critical of Metzger's failure to verify the specificity of the restriction enzyme which he had used.

Libby testified that other problems with Metzger's DNA analysis included the poor quality of the blood sample taken from Jeff Stephens' sweatshirt, and the degradation of virtually all of the DNA samples. In Libby's opinion, all of the autorads produced by Metzger had extra bands, or bands that were too light or too dark, due to the insufficiency of the enzyme cutting process, the contamination or degradation of the samples, or other causes. For these reasons and others, Libby concluded that Metzger was not justified in finding a match between defendant's DNA sample and the evidence semen sample.

Dr. Lawrence Mueller, an associate professor in the Department of Ecology and Evolutionary Biology at the University of California, Irvine, was the defense's second expert witness regarding DNA. Mueller insisted that the product rule, used by Metzger to calculate the random match probability of 1 in 15 billion for the evidence semen sample, was not a scientifically valid method. Mueller noted that in its 1992 report, the NRC recommended that the interim ceiling principle be used to calculate profile frequencies. The NRC also recommended that population databases include a large number of heterogeneous population subgroups. The NRC committee which made these recommendations included many distinguished scientists, including Mueller himself. Mueller believed that there was a significant dispute in the scientific community regarding the NRC recommendations. Using the interim ceiling approach and a database which included several heterogenous population groups from around the world, Mueller calculated that the random match probability of the DNA profile of the evidence semen sample produced by using five of the nine probes which Metzger had used was 1 in 1,800.

Robert Anderson testified that he drove past the Stephens' house at about 5:45 a.m. on November 25, 1991, while on his way to work. Anderson stated that he saw a large, “tannish” colored car parked in the Stephens' driveway and two men talking nearby. One of the men was taller than the other man, had dark, wavy hair, and was wearing a blue down-type coat. The shorter of the two men had blond, fluffy hair and was wearing a white and blue or black checkered shirt or coat. Defendant did not resemble either of the two men. Anderson subsequently met with Will County officers and identified two photographs of certain models of cars as possibly being the one he had seen in the Stephens' driveway. Nine months later, Will County Sheriff's investigator Gloria DeLeon drove Anderson around the nearby town of Coal City to see if he could identify the car he had seen. He did so. On cross-examination Anderson testified that he drove by the Stephens' house at 45 miles per hour on the morning of the crime and that it was very dark out. He also stated that his car's headlights swept across the Stephens' house as he made a turn onto Route 102 and that nearby street and porch lights provided further illumination of the scene.

Jeffrey Ford testified that in November 1991, he worked at the Super Value grocery store in Wilmington where the Stephens' Plymouth Laser was discovered. At 6:30 a.m. on November 25, 1991, Ford saw a man standing by the Laser in the parking lot. He heard a car alarm being set or turned off. The man Ford saw was approximately 6 feet tall, was skinny, and had short, dark hair. Ford testified that the man did not resemble defendant. However, Ford also stated that he could not identify the man he had seen.

Christine Adermann, defendant's stepdaughter, testified that in November 1991, defendant had mostly black hair with some gray in it, had a stocky build, and wore a mustache. Defendant owned a black and gray van and smoked only “Camel” cigarettes. Christine stated that defendant worked in construction and that he had a junking business on the side. She also stated that it would not be unusual for defendant to get up early on garbage days to check people's trash for salvageable items. Diana Clover, defendant's sister, substantiated Christine's testimony.

Richard Baum, a private investigator, videotaped the route which Michael Adermann took through Ritchie on the morning of November 25, 1991. The purpose of the videotape was to determine if the village hall could be seen from various points along the route. Baum acknowledged that the foliage conditions seen in the videotape would have differed on November 25, 1991.

Gloria DeLeon, head investigator for the Will County sheriff's department on this case, testified that she interviewed Heather several times. She also showed her approximately 14 photo lineups, two of which included pictures of defendant. Heather never made any comment about defendant's pictures and was never able to identify anyone as her assailant. DeLeon stopped showing photographs to Heather after preliminary DNA results were obtained from Metzger, even though further viewings were scheduled. DeLeon stated that she stopped showing photographs to Heather because Heather had told her that she no longer thought she could pick anyone out of a lineup. DeLeon did not record this statement in a police report.

In the State's rebuttal, DeLeon narrated a videotape which purported to show the view of the Stephens' driveway and home which Robert Anderson would have had as he drove by at 45 miles per hour on the morning of November 25, 1991.

William Frank, DNA Research Coordinator for the Illinois State Police, testified for the State as an expert in forensic DNA analysis. Frank stated that he had reviewed the work which Metzger had done on defendant's case. He discussed the quality control measures which Metzger employed and stated that he agreed with Metzger's findings. Frank acknowledged that there were artifacts, or marks other than bands, on the autorads produced by Metzger. Frank maintained, however, that these artifacts were normal and harmless, and that they did not compromise Metzger's analysis in any way.

At the conclusion of Frank's testimony, the State rested. Following arguments, the jury convicted defendant of first degree murder, attempted first degree murder, aggravated battery with a firearm, aggravated criminal sexual assault, and home invasion.

During the eligibility phase of the death penalty proceedings, the defense called two witnesses, Gloria Deleon and Kevin Stephens. DeLeon repeated her testimony regarding Robert Anderson's identification of the car in Coal City. DeLeon testified that upon investigation, she learned that this car belonged to Julianna Roul, the girlfriend of Kevin Stephens, Jeff Stephens' first cousin. DeLeon stated that after Anderson identified the car, a blood sample was taken from Kevin Stephens and compared to the evidence semen sample. This analysis eliminated Kevin Stephens as a suspect. DeLeon also stated that Kevin Stephens' best friend was Joseph Collins. Collins was described as being 5 feet 1 inch tall, 25 years old, and as having blond hair. In her testimony, DeLeon did not indicate whether a blood sample was taken from Collins. Kevin Stephens substantiated DeLeon's testimony.

Following arguments, the jury found defendant eligible for the death penalty for having committed murder in the course of another felony.

At the final phase of sentencing, the State presented two witnesses in aggravation. Heather read her victim impact statement to the jury. Terry Kreimeier, a Will County sheriff's investigator, testified that in 1992, defendant pled guilty to a charge of criminal sexual assault involving his stepdaughter, Michelle Adermann. Kreimeier also testified as to other acts of sexual misconduct and threats of violence involving Michelle Adermann and her sister Christine Adermann. The jury was also told that defendant pled guilty to a charge of burglary in 1977.

In mitigation, the defense called two witnesses. Harold Barnes, the defense's mitigation preparation expert, interviewed 16 family members and 21 friends or neighbors of defendant. Barnes described defendant's life from his youth until the time of trial. Barnes stated that as a young man, defendant contracted polio. He also struggled with his family's poverty and his mother's illnesses and nervous breakdowns.

Barnes testified that defendant dropped out of high school and, at the age of 18, was married. Defendant and his wife had two children. However, they were divorced due to his wife's unfaithfulness. Barnes explained that the loss of his family was devastating to defendant. Later, defendant married Linda Adermann, and cared for her three children from a previous marriage, Michael, Michelle, and Christine. Defendant had one child with Linda, a boy named David. Barnes stated that, after a time, Linda began deserting the family, occasionally for months at a time. Eventually, Linda abandoned her family entirely. During the times that Linda was away from the family, defendant cared for the three Adermann children as well as David. The Adermann children and David all told Barnes that defendant was a strict, but good, parent. Defendant's friends and neighbors spoke well of defendant. Barnes also stated that defendant was a model prisoner during two previous terms in prison.

Diana Clover, defendant's sister, also told the jury about how defendant had cared for the Adermann children after their mother left them. Clover had custody of Christine Adermann and David Hickey. Clover stated that both children loved defendant.

The jury found that the mitigation evidence was insufficient to preclude a death sentence, and that sentence was imposed. This appeal followed.

Analysis

Admission of the DNA Evidence

Prior to trial, defendant requested a hearing pursuant to 
Frye v. United States
, 293 F. 1013 (D.C. Cir. 1923), to contest the admissibility of the DNA evidence offered by the State. See 
People v. Thomas
, 137 Ill. 2d 500, 517 (1990). Under 
Frye
, novel scientific evidence must be generally accepted in the relevant scientific community before it may be admitted in court. 
Thomas
, 137 Ill. 2d at 517. In his motion requesting a 
Frye
 hearing, defendant asserted that the RFLP method of DNA profiling in general, and the protocol which Metzger followed in performing the RFLP analysis in this case, were not generally accepted in the relevant scientific community. Defendant also alleged that the product rule was not a generally accepted means of calculating the frequency with which a DNA profile occurs in a population. Accordingly, in his motion, defendant argued that the DNA evidence should not be admitted at trial. After hearing arguments, the trial court declined to hold a 
Frye
 hearing and ruled that the DNA evidence was admissible. The trial court based its holding upon the fact that in another, unspecified circuit court case, it had conducted a 
Frye
 hearing and had found the RFLP method of DNA analysis, and the product rule, generally accepted by the relevant scientific community.

In his opening brief before this court, defendant repeats the assertions which he made in his pretrial motion for a 
Frye
 hearing. Defendant argues that there is significant controversy in the scientific community regarding the forensic use of the RFLP technique and the use of the product rule. Defendant asserts that because these scientific procedures are not generally accepted by the relevant scientific community, the trial court's refusal to hold a 
Frye
 hearing, and its subsequent admission of the DNA evidence, constitute reversible error.

Shortly after defendant's initial brief was filed, this court addressed the challenges raised by defendant with respect to the admissibility of RFLP profiling in another case. In 
People v. Miller
, 173 Ill. 2d 167 (1996), we concluded that the forensic use of RFLP analysis is generally accepted by the relevant scientific community. We also concluded that the product rule is a generally accepted method of calculating DNA profile frequencies. 
Miller
, 173 Ill. 2d at 188-89. Nothing has occurred in the short time since our decision in 
Miller
 was issued which would cast doubt upon the results reached in that case. To the contrary, recent developments in the scientific community indicate continued support for the use of RFLP profiling and for the use of the product rule. In the latter part of 1996, the NRC released an update to the 1992 report referred to by defense witnesses Randell Libby and Lawrence Mueller in their testimony at trial. The 1996 report concludes that “[t]he state of the profiling technology and the methods for estimating frequencies and related statistics have progressed to the point where the admissibility of properly collected and analyzed DNA data should not be in doubt.” National Research Council, The Evaluation of Forensic DNA Evidence, Committee of DNA Forensic Science: An Update 36 (National Academy Press 1996) (hereafter NRC Update). The update also specifically concludes that sufficient data have been gathered to establish that the interim ceiling principle is not needed and further recommends that, in general, the calculation of a profile frequency should be made with the product rule. NRC Update at 5, 35. See also 
State v. Copeland
, 130 Wash. 2d 244, 261-68, 922 P.2d 1304, 1315-19 (1996) (finding the product rule generally accepted in the relevant scientific community); 
State v. Johnson
, 186 Ariz. 329, ___, 922 P.2d 294, 300 (1996) (discussing a prepublication version of the NRC Update); 
Brim v. State
, 695 So. 2d 268, 273 (Fla. 1997) (noting that the NRC disavowed the interim ceiling principle in its 1996 update).

In light of our decision in 
Miller
, and the 1996 NRC report, we conclude that defendant was not prejudiced by the trial court's failure to hold a 
Frye
 hearing. Furthermore, we note that the issues which defendant has raised with respect to the caliber of the work performed by Metzger in this case, including laboratory protocol and the manner in which it was followed, the various quality control and quality assurance measures which Metzger employed, and the possible contamination or degradation of the DNA samples, are not properly subject to a 
Frye
 analysis. Instead, these issues go to the weight of the evidence, and not its admissibility under 
Frye
. See 
Copeland
, 130 Wash. 2d at 268-76, 922 P.2d at 1319-23; 
People v. Dalcollo
, 282 Ill. App. 3d 944, 957 (1996); see also 
Thomas
, 137 Ill. 2d at 518. Defendant was afforded ample opportunity, through the granting of extensive discovery and the services of two expert witnesses, to present to the jury his criticisms regarding the quality of the work which Metzger performed in this case. The State's experts were also able to present their opinions on the caliber of Metzger's work. We find no error in the admission of the DNA evidence.

Failure to Hold a Franks Hearing

Beginning in April 1992, and continuing through March 1993, the Will County sheriff's department and the Wilmington police department received four anonymous tips indicating that defendant was involved in the murder of Jeff Stephens and the attempted murder and sexual assault of Heather Stephens. Gloria DeLeon, the head investigator for the Will County sheriff's department, learned that defendant was incarcerated in the Illinois Department of Corrections in 1992 as a result of a conviction for sexual abuse of his stepdaughter, Michelle Adermann. Under section 5–4–3 of the Unified Code of Corrections (730 ILCS 5/5–4–3 (West 1994)), certain sex offenders and sexually dangerous persons are required to submit blood specimens to the State Police for the purpose of establishing a data bank composed of DNA profiles. Pursuant to this statute, a blood sample was taken from defendant, the DNA extracted, and an RFLP analysis performed. The resulting profile was stored in the sexual offenders DNA data bank.

On April 6, 1993, a search of the data bank indicated a preliminary match between defendant's DNA profile and the profile of the DNA extracted from the semen found on Heather's panties and on the vaginal swabs taken of her at the hospital on November 25, 1991. Subsequently, on April 14, 1993, DeLeon submitted a complaint for a search warrant to obtain samples of defendant's blood and saliva. Included with the complaint was a supporting affidavit authored and sworn to by DeLeon. On the strength of the affidavit, the search warrant was issued and a blood sample was collected from defendant. This blood sample was eventually forwarded to Metzger at the State Police laboratory and used in his DNA analysis.

After defendant was charged with the instant offenses, he filed a motion for an evidentiary hearing, under 
Franks v. Delaware
, 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978), to challenge the search warrant and to suppress the DNA evidence. According to defendant, DeLeon intentionally or with reckless disregard for the truth omitted crucial information from the warrant affidavit, particularly with respect to the preliminary DNA results obtained from the search of the sexual offenders DNA data bank. The trial court heard arguments on defendant's motion and concluded that a 
Franks
 hearing was not warranted. Before this court, defendant maintains that the trial court erred in denying him a 
Franks
 hearing. Defendant requests this court to order the suppression of the DNA evidence and a grant him a new trial or, alternatively, to remand for a 
Franks
 hearing.

In 
Franks
, the United States Supreme Court held that in certain limited circumstances, a defendant may be allowed an evidentiary hearing to challenge the truthfulness of the affidavit used by the police to obtain a search warrant. In order to obtain a 
Franks
 hearing, the defendant must make a “ `substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit,' ” and that “ `the allegedly false statement is necessary to the finding of probable cause.' ” 
People v. Lucente
, 116 Ill. 2d 133, 147 (1987), quoting 
Franks
, 438 U.S. at 155-56, 57 L. Ed. 2d at 672, 98 S. Ct. at 2676. The substantial preliminary showing necessary to warrant a 
Franks
 hearing requires the defendant to offer proof that is “somewhere between mere denials on the one hand and proof by a preponderance on the other.” 
Lucente
, 116 Ill. 2d at 152. In addition, if after setting the allegedly false material to one side there is sufficient information left in the affidavit to support a finding of probable cause, a hearing is not required. 
Franks
, 438 U.S. at 171-72, 57 L. Ed. 2d at 682, 98 S. Ct. at 2684.

The reasoning of 
Franks
 extends to those situations where information necessary for a determination of probable cause is intentionally or recklessly omitted from the warrant affidavit. 
People v. Stewart
, 105 Ill. 2d 22, 43 (1984). In these situations, in order to be granted a hearing, a defendant must show that the information was omitted with the purpose of misleading the judge issuing the warrant, and that the omitted information was material to the determination of probable cause. 
Stewart
, 105 Ill. 2d at 44. For omitted information to be material to the determination of probable cause, and thus, “ `to serve as the basis for a hearing under 
Franks
, it must be such that its inclusion in the affidavit would defeat probable cause.' ” 2 W. LaFave, Search & Seizure §4.4(c), at 498 (3d ed. 1996), quoting 
United States v. Colkley
, 899 F.2d 297, 301 (4th Cir. 1990); 
Stewart
, 105 Ill. 2d at 47.

The pertinent portions of DeLeon's affidavit state:

“An interview was conducted eventually of Heather Stephens when her condition improved and she described her attacker as a male/white, approximately 5'2” to approximately 5'5”, approximately 140 lbs., light colored hair and on the younger side. It is important to state that Heather Stephens is extremely poor sighted and she did not have glasses on at the time of her sexual assault. Her sexual assault also occurred in a dark area and she stated she did not get a good look at the individual who assaulted her although she feels that is she saw him again, she could identify him. ***

*** 
Arthur Dale Hickey fits the general size description of the offender
 but Mr. Hickey is older than what was described by Heather Stephens in that Mr. Hickey was born in 1951. Throughout this investigation, on numerous occasions, Heather Stephens has observed mug books and groups of photographs of people, with each group being approximately 20 to 40 people. Heather Stephens has observed over 300 of these photographs and approximately 2 or 3 times the photo arrays shown to her included Arthur Dale Hickey and she has never picked out Mr. Hickey as being her attacker.

*** The State Police had occasion to receive a blood sample which was labeled as coming from Mr. Hickey and that blood sample was worked up in such a manner that comparable DNA testing was done on that blood sample. 
The genetic markers from Mr. Hickey's DNA testing matched the genetic markers of the semen obtained from the victim, Heather Stephens.
 This was done similar to the State Police's use of a computer to perform AFIS fingerprint comparisons. David Metzger of the Illinois State Police, Division of Forensic Services, who is the DNA research coordinator, contacted your complainant with a letter stating of this match through the use of the DNA index data base containing Mr. Hickey's known sample. Mr. Metzger requests that your complainant obtain additional blood and saliva standards from Mr.Hickey to insure the chain of evidence on Mr. Hickey's blood so that the DNA of Hickey's blood can be directly compared to the DNA from the semen sample retrieved from Heather Stephens.” (Emphasis added.)

DeLeon's affidavit also states that four anonymous tips were received which implicated defendant in the instant crimes.

Defendant asserts that DeLeon made three major misrepresentations in her affidavit, the first two of which relate to the physical description of defendant. First, defendant maintains that DeLeon omitted several of the physical characteristics of defendant. Specifically, defendant states that DeLeon omitted the fact that she knew defendant had dark or brown hair in 1991; omitted the fact that defendant weighed at least 165 pounds in 1991; omitted the fact that defendant is 5 feet 6 inches tall; omitted the fact that defendant was 40 years old in November 1991; and omitted the fact that while Heather had stated that her attacker had no facial hair, defendant had a mustache in 1991. Second, defendant maintains that DeLeon made an affirmative misstatement when she noted that “Arthur Dale Hickey fits the general size description of the offender.”

The third alleged misrepresentation, and the most significant in defendant's view, is that DeLeon omitted important contextual information with respect to the results obtained from the search of the sexual offenders DNA data bank. In support of this contention, defendant points to a letter which DeLeon received from Metzger's office three days before she submitted her affidavit. The letter states that the DNA from the evidence semen was searched against the sexual offenders data bank at three loci. It then states that defendant “demonstrates a DNA profile that is consistent with the evidence profiles and could be the donor of the seminal material identified. This finding can be used for investigative purposes. However, it will be necessary to submit additional blood and saliva standard samples from Mr. Hickey for confirmatory forensic analysis.”

Defendant argues that DeLeon should have explained in her affidavit that the “match” which resulted from the search of the sexual offenders data bank was merely a 
preliminary
 result, obtained, as the letter from Metzger's offices states, from a three-probe, RFLP analysis. Defendant maintains that DeLeon should have noted that the State Police laboratory requires that a DNA sample be subjected to a minimum of four or five probes to obtain a meaningful RFLP profile. According to defendant, DeLeon also should have stated that a blood sample was needed from defendant not only to insure the chain of custody but, more importantly, to confirm the results of the preliminary, three-probe analysis. Without this contextual information, defendant asserts that the judge who issued the search warrant had no way to gauge the significance of the match which resulted from the search of the sexual offenders data bank. Defendant maintains that he has made a substantial preliminary showing that DeLeon intentionally, or with reckless disregard for the truth, omitted this contextual information, as well as the information regarding defendant's physical characteristics. From this, defendant argues that the trial court erred in denying him a 
Franks
 hearing. We disagree.

The probable cause requirement necessary to support the issuance of a search warrant is rooted in principles of common sense. “The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the `veracity' and `basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of the reviewing court is simply to ensure that the magistrate had a `substantial basis for ... conclud[ing]' that probable cause existed.” 
Illinois v. Gates
, 462 U.S. 213, 238-39, 76 L. Ed. 2d 527, 548, 103 S. Ct. 2317, 2332 (1983), quoting 
Jones v. United States
, 362 U.S. 257, 271, 4 L. Ed. 2d 697, 708, 80 S. Ct. 725, 736 (1960); see also 
People v. Tisler
, 103 Ill. 2d 226 (1984).

In the case at bar, the finding of probable cause for the issuance of the search warrant rested primarily on the DNA information contained in the warrant affidavit. This court has determined that RFLP profiling is generally accepted in the relevant scientific community and, thus, satisfies the 
Frye
 standard of admissibility. 
Miller
, 173 Ill. 2d at 188-89. The identification of defendant through the sexual offenders data bank was based upon RFLP analysis. In addition, while a match across three loci may in general be considered preliminary, such a match unquestionably establishes a “fair probability that *** evidence of a crime will be found” (
Gates
, 462 U.S. at 238, 76 L. Ed. 2d at 527, 103 S. Ct. at 2332) in the identified suspect's blood sample. Accordingly, even if DeLeon's affidavit had explained that the search of the sexual offenders DNA data bank indicated only a preliminary match between defendant's DNA and the evidence semen DNA, probable cause would exist to support the issuance of the search warrant for defendant's blood sample. We note, moreover, that a contrary result would seriously undermine, if not eliminate, the usefulness of the sexual offenders data bank as a means of identifying and locating perpetrators of offenses where DNA evidence is the only meaningful evidence recovered. Finally, if the statement that “defendant fits the general size description” given by Heather were set to one side, and if the omissions regarding defendant's physical characteristics were included in the affidavit, the finding of probable cause based upon the DNA information would not be altered. Therefore, we conclude that the trial court did not err in denying defendant a 
Franks
 hearing.

Shifting of the Burden of Proof

Defendant argues that he is entitled to a new trial because the prosecutor improperly shifted the burden of proof to defendant in his cross-examination of defense expert Randell Libby and in his closing argument. The following relevant exchange occurred during the prosecutor's cross-examination of Libby:

“Q. Now, one of the things the NRC says that–is that scientifically the best way to resolve ambiguity is to repeat the experiment. Do you agree with that?

A. I would agree, yes.

Q. Now, you know from the case that Mr. Metzger, after his completion of the case, had extra sample left?

A. Well, no, I do not agree that he had extra sample left which was untested or unmanipulated by that laboratory. I agree that there are some extra pieces [of] Exhibit 31, swab number 1.

Q. That's right. There was an extra swab left, right?

A. No, there was not an extra swab, there was a partially, sort of manipulated, consumed swab which is sort of remaining. But I would have the same position with retesting that the FBI has.”

Defense counsel objected to this line of questioning, arguing that it improperly suggested to the jury that the defense had a burden to perform further DNA testing. The trial court, outside the presence of the jury, sustained the objection. Later, during closing argument, the prosecutor stated that Libby “didn't like it” when he was questioned about the NRC's conclusion that the best way to cure ambiguous test results is to rerun the test.

Citing to 
People v. Weinstein
, 35 Ill. 2d 467 (1966), defendant asserts that the prosecutor's questioning of Libby and his comments during closing argument improperly shifted the burden of proof to defendant and, therefore, that he is entitled to a new trial.

In 
Weinstein
, the prosecutor told the jury, on five or six occasions during closing argument, that it was the burden of defendant to present evidence creating a reasonable doubt of her guilt. At one point, the prosecutor confusingly stated that “to overcome the presumption of innocence she must raise this reasonable doubt.” 
Weinstein
, 35 Ill. 2d at 469. This court concluded that the “persistent and repeated arguments” of the prosecutor destroyed the presumption of innocence, imposed a heavier burden upon the defendant than the law required, and “manifestly prejudiced the defendant.” 
Weinstein
, 35 Ill. 2d at 469-70.

The questions and statements of the prosecutor in the case at bar clearly do not rise to the level of the inappropriate arguments made in 
Weinstein
. In this case, the prosecutor never told the jury that defendant had a burden of proof at trial, and certainly did not make repeated arguments to that effect. See 
People v. Leger
, 149 Ill. 2d 355, 400 (1992) (no error found, in part, because the prosecutor made only one comment which allegedly shifted the burden of proof). In addition, defense counsel told the jury that defendant did not have to prove his innocence, and the jury was so instructed by the trial court. Furthermore, any inference which the prosecutor sought to plant with the jury with respect to defendant's duty to test the semen sample found on the swabs was precluded, in large measure, by Libby's answer that there was no swab remaining which had not been manipulated or consumed by the testing performed by the state police laboratory. For these reasons, we reject defendant's contention that the prosecutor's questions and statement constitute reversible error.

Closing Argument

Defendant contends that comments which the prosecutor made during the rebuttal portion of his closing argument were so improper as to have denied him a fair trial. Defendant categorizes these comments as attacks on the defense attorneys, attacks on the credibility of Libby, and comments improperly vouching for the credibility of one of the State's expert witnesses, Michael Conneally.

Defendant cites three statements made by the prosecutor as being attacks on defense counsel. At the beginning of his closing argument, the prosecutor told the jury that defense counsel had made “a prolonged effort to misdirect you from the relevant evidence in this case.” Later, the prosecutor addressed the defense's argument in regard to defendant's stepson, Michael Adermann:

“MR. MCCABE [prosecutor]: And [defense counsel] is right when he says that he didn't come forward because he didn't want to probably hurt his stepfather. That's probably accurate. I don't think there is any question about it. But then he suggests now this only–
you only hear this from a defense attorney
, he then discusses, well, then he asked a question, well, if he doesn't want to hurt his stepfather, why doesn't he just lie? 
You know, only from a defense attorney. You know, it's like people don't feel strongly about telling the truth
. you know that it doesn't mean–

MR. KIELIAN [defense counsel]: I'm going to object to that. That's completely improper. Completely.

THE COURT: Overruled.” (Emphasis added.)

The prosecutor also told the jury that it should not “swallow” the defense characterization of Michael Adermann “along with all the other smoke.”

With respect to the “misdirection” and “smoke” comments, defendant failed to object to them at trial, and his post-trial motion makes no mention of them. Thus, defendant has waived any error in relation to these comments. 
People v. Enoch
, 122 Ill. 2d 176, 186 (1988). In addition, we decline to consider defendant's arguments regarding these statements under the plain error doctrine. 134 Ill. 2d R. 615(a). Under the doctrine of plain error, a reviewing court may consider an error not properly preserved at trial where the evidence is closely balanced or the error was so fundamental and of such magnitude as to deny the defendant a fair trial. 
Miller
, 173 Ill. 2d at 191-92. We do not believe that either of these circumstances applies in this case.

With respect to the “only from a defense attorney” comments, we agree that they were improper. However, we do not believe that they were so improper as to warrant reversal of defendant's convictions. Comments made by a prosecutor during closing argument will “constitute reversible error only when they engender substantial prejudice against a defendant [citation] such that it is impossible to say whether or not a verdict of guilt resulted from those comments.” 
People v. Henderson
, 142 Ill. 2d 258, 323 (1990). In this case, the evidence offered by the State's expert David Metzger demonstrated that defendant's DNA profile matched the profile of the DNA extracted from the evidence semen sample. Metzger's testimony also indicated that under the product rule, the odds of a random match were 15 billion to 1. Defendant lived in the same small town as the victims and his job as a salvager gave him a reason to be at the victims' home early in the morning on garbage day. Defendant's stepson testified that on the morning of the crimes, he picked defendant up at a gas station near the grocery store where the victims' car was recovered and that he saw defendant's van parked near the victims' home. In addition, the jury was instructed that the closing arguments of counsel were not evidence that it could consider in determining guilt or innocence. Given these facts, we can conclude that the guilty verdicts did not result from the “only from a defense attorney” comments. Thus, these comments did not engender substantial prejudice against defendant sufficient to warrant reversal of his convictions.

Defendant next asserts that the prosecutor improperly attacked the credibility of Libby. During closing argument, the prosecutor made the following statements:

“MR. MCCABE: And who is Dr. Libby? Who is he? He's an academic. He's an assistant professor making 35 grand who jumped to $120,000 a year to testify for criminal defendants. That's what he is.

MR. MARKESE [defense counsel]: Objection, judge. That's an incorrect characterization, and if they don't like my witnesses, threats are one thing, but I don't think personal attacks do anything to the evidence or help this jury resolve the facts.

THE COURT: Overruled.

MR. MCCABE: That's who he is. Now, knowing that, that that is his bread and butter these days, and that's sort of a nice lifestyle by anyone's standards, how many times do you think someone like him is going to say, `David Metzger did a real nice job. I don't have any problem with that.' I would suggest to you, you're never going to hear that from him.”

Defendant argues that these statements told the jury that Libby would testify to anything so long as he was paid and, thus, that these statements amounted to improper, inflammatory character assassination.

“The credibility of a witness is a proper subject for closing argument if it is based on the evidence or inferences drawn from it.” 
People v. Hudson
, 157 Ill. 2d 401, 445 (1993). In this case, Libby testified that he had increased his income considerably when he began testifying as an expert in DNA analysis in criminal trials. Libby also stated that he testified primarily for defendants. In light of these facts, we conclude that the prosecutor's statements were acceptable comments on Libby's possible bias and “did not amount to an accusation that defense counsel suborned perjury.” 
Hudson
, 157 Ill. 2d at 445; 
cf
. 
People v. Lyles
, 106 Ill. 2d 373, 397-414 (1985) (reversible error found, in part, because the prosecutor called a defense expert “a liar,” “a fraud,” and “a member of the oldest profession known to man,” and the cross-examination of the witness was a series of “humiliating and demeaning personal attacks” on the witness).

Defendant also asserts that the prosecutor improperly vouched for the credibility of Michael Conneally. The prosecutor told the jury, “I think of all the experts you heard here, you know, clearly Dr. Conneally is the most credible of anyone you heard.” Defense counsel did not object to this statement at trial or cite to it in his post-trial motion. Accordingly, defendant has waived any error in relation to this statement. 
Enoch
, 122 Ill. 2d at 186.

Proof of Home Invasion

An individual other than a peace officer acting in the line of duty commits home invasion when “without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present.” 720 ILCS 5/12–11 (West 1992). Defendant asserts that there is no proof that when he entered the Stephens' home, he had “reason to know” that anyone was in the home. Thus, according to defendant, his conviction for home invasion must be reversed for lack of evidence. Relying on 
People v. Simms
, 143 Ill. 2d 154, 168-73 (1991), defendant then maintains that because home invasion was one of the bases submitted for a finding of death eligibility under section 9–1(b)(6) of the Criminal Code of 1961 (720 ILCS 5/9–1(b)(6) (West 1994)), and because the jury returned a general verdict of eligibility, his death sentence must be reversed and the cause remanded for resentencing.

It is well established that “[i]n a prosecution for home invasion, knowledge may be proven by circumstantial evidence so long as the State presents sufficient evidence from which an inference of knowledge can be made.” 
People v. Ramey
, 240 Ill. App. 3d 456, 462 (1992) (and cases cited therein). In the case at bar, the evidence showed that the offenses occurred before dawn on a weekday–a time when most persons are asleep or are just getting up to go to work. See 
People v. Frisby
, 160 Ill. App. 3d 19, 30-31 (1987) (the fact that the defendant's entry into the dwelling occurred at 4 a.m. was significant in establishing that the defendant had reason to know someone was at home); 
People v. Tackett
, 150 Ill. App. 3d 406, 420 (1986) (element of knowledge established, in part, by the fact that defendant entered the home at 1 a.m.). In addition, two cars were parked in the Stephens' driveway at the time of the offenses, and the defendant entered the house carrying a gun. Both of these facts help establish that defendant had reason to know that someone was in the Stephens' home. See
 People v. Redisi
, 172 Ill. App. 3d 1003, 1011 (1988) (element of knowledge established, in part, by the fact that the victim's car was parked in the driveway); 
Tackett
, 150 Ill. App. 3d at 420; (element of knowledge established, in part, by the fact that the defendant was carrying string to tie up anyone found in the house, and by the fact that the defendant may have seen the victim's car in the garage). Also, defendant had lived in the small town of Ritchie for several years and had routinely checked other people's trash for salvageable items. This fact made it probable that defendant knew that Jeff did not live alone in the house. Considered together, the factors outlined above provide sufficient evidence to support the jury's finding that defendant had reason to know that someone was in the Stephens' house when he entered it. See, 
e.g.
, 
Frisby
, 160 Ill. App. 3d at 30-31; 
Tackett
, 150 Ill. App. 3d at 420; 
Redisi
, 172 Ill. App. 3d at 1010-11. Therefore, we decline to reverse defendant's conviction for home invasion.

The Felony-Murder Eligibility Factor

Defendant was found eligible for the death penalty based upon murder committed “in the course of *** [one or more of the following felonies]: armed robbery, *** aggravated criminal sexual assault, *** home invasion.” 720 ILCS 5/9–1(b)(6) (West 1994). Defendant notes that the shooting of Jeff Stephens occurred outside the Stephens' house at the end of the driveway, and that the other felonies of which he was convicted subsequently took place inside the house. From this, defendant argues that none of the felonies occurred in “the course of” the murder. Therefore, according to defendant, he is not eligible for the death penalty.

“This court has repeatedly held that, in order to establish the aggravating factor of murder in the course of another felony, the State need 
not
 prove that the commission of the underlying felony had begun when the murder occurred. [Citations.] Rather, all that must be proved is that the murder and the other felony were committed either simultaneously or as part of the same criminal episode.” 
People v. Hampton
, 149 Ill. 2d 71, 88-89 (1992). In the case at bar, Heather testified that she heard yelling and a gunshot from outside the house, and that she looked out her window but was unable to see what was happening. She then went to get her bathrobe, which hung on the back of the bedroom door. Before she could finish putting her robe on, defendant appeared in her bedroom doorway, thus indicating that defendant entered the house immediately after shooting Jeff. After defendant tied Heather to the bed, he returned outside to drag Jeff into the house. Consequently, the home invasion occurred immediately after the shooting and before defendant had finished moving Jeff. In addition, the aggravated criminal sexual assault had begun before defendant brought Jeff into the house. The armed robbery then followed directly after the sexual assault. The evidence clearly shows a closely related and partially interrelated series of offenses. Therefore, we conclude that the jury was justified in finding that the murder was committed in the course of the other felonies.

Trial Court's Excusal of Venireman Hodgdon

During jury selection the trial court excused venireman Hodgdon because he had expressed reservations about the death penalty. Citing to 
People v. Brisbon
, 106 Ill. 2d 342 (1985), defendant argues that by excusing Hodgdon, the trial court denied defendant his right to rehabilitate those who have expressed personal objections to the death penalty but who have not indicated that they would refuse to follow the law and the court's instructions regarding the death penalty.

The pertinent portion of Hodgdon's 
voir dire
 follows:

“THE COURT: Are your feelings about the death penalty such that you would refuse to consider the imposition of the death penalty in any case where the defendant has been convicted of murder?

A. Yes.

Q. Do you have any religious or moral scruples, either for or against the death penalty, that would interfere with your duty to follow the law and sign a proper verdict?

A. Yes.

Q. Are your beliefs such that regardless of the facts or the background of the defendant, that if the defendant were found guilty as charged of the offense of murder, that you would automatically vote either to impose or not to impose the death penalty?

A. I think I understand that. Can I have you read that again. I'm sorry.

Q. Sure. [The question was repeated.]

A. Yes.

Q. Now, you had indicated before that there was something in there that would prohibit you. Are you indicating that under any circumstances you could not vote to impose the death penalty?

A. That is correct.

MR. MARKESE [defense counsel]: I would like to approach.

THE COURT: Take him out in the hall just one moment.

(Juror Hodgdon exits courtroom.)

MR. MARKESE: I want the opportunity to address the juror and try to rehabilitate him.

THE COURT: That's denied.

MR. MARKESE: Judge you have to give us that opportunity.

THE COURT: No, I don't. He has made an unequivocal statement with regards to the fact that he would not impose it, and he has answered that way in every way that I have asked the question. If you think you are going to sit there and say if Hitler were on trial, could you give it to him?

MR. KIELIAN [defense counsel]: Or Mark Furman, let me throw that in, to be current.

THE COURT: Do you have a question you would like me to ask him? Do you want to pose a question to him?

MR. MARKESE: No, I want to talk to him.

THE COURT: Okay. That's denied. Bring him back in.”

A prospective juror in a capital case can be excused for cause when the juror's views on capital punishment would “ ` “prevent or substantially impair [his ability to perform his duty] as a juror in accordance with [the law] and his oath.” ' [Citations.]” 
People v. Simms
, 168 Ill. 2d 176, 187-88 (1995). In addition, “a trial court's decision to exclude a juror is entitled to deference since it is in the best position to weigh a prospective juror's responses to 
voir dire
.” 
Simms
, 168 Ill. 2d at 188. Venireman Hodgdon unequivocally stated that his beliefs would interfere with his duty to follow the law and sign a proper verdict, and further stated that he could not impose the death penalty under any circumstances. Also, the trial court offered to ask Hodgdon any question which defense counsel wished to have asked. Defense counsel declined to give the trial court a question. Accordingly, we find that the trial court did not err in excusing venireman Hodgdon.

Constitutionality of the Death Penalty Statute

Defendant argues that the Illinois death penalty statute is unconstitutional because it places a burden of proof upon defendants to show that mitigating evidence outweighs aggravating evidence, and because it permits the sentencer to consider a vague aggravating factor, namely, “any other reason” beyond the statutory factors why a defendant should be sentenced to death. See 720 ILCS 5/9–1(c), (e) (West 1994); Illinois Pattern Jury Instructions, Criminal, No. 7C.06 (3d ed. 1992). This court has previously rejected both of these contentions. 
People v. Taylor
, 166 Ill. 2d 414, 439 (1995) (and cases cited therein). We decline to depart from our prior holdings on these issues.

Defendant also asserts that the death penalty is unconstitutional because it fails to sufficiently minimize the risks that death sentences will be arbitrarily and capriciously imposed. This contention has also been rejected by this court (see, 
e.g.
, 
Taylor
, 166 Ill. 2d at 440), and we decline to revisit our holdings on this issue.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Will County is affirmed. The clerk of this court is directed to enter an order setting Wednesday, January 21, 1998, as the date on which the sentence of death entered in the circuit court of Will County, is to be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119–5 (West 1996). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is confined.

Affirmed
.

FOOTNOTES
1:
The admissibility of PCR profiling is not at issue in this appeal.