THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DARRYL PAYNE, Defendant-Appellant.

First District (3rd Division)   No. 1—93—3902

Opinion filed June 19, 1996.

Rita A. Fry, Public Defender, of Chicago (Ronald P. Alwin, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee G. Goldfarb, Janet Powers Doyle, and Abigail Abraham, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

After a jury trial, defendant, Darryl Payne, was convicted of first degree murder and sentenced to a term of 38 years in the Illinois Department of Corrections. On appeal, defendant contends that (1) the trial court erred in denying defendant's motion to suppress evidence of his dental impressions; and (2) the prosecutor's comments during closing arguments were so prejudicial as to deprive defendant of a fair trial. We affirm.

On May 21, 1990, investigating officer Detective Lewellyn found Jeanell Bunn's body lying under a rotted mattress in the backyard of an abandoned house. The detective observed several bite marks on the somewhat decomposed body. Detective Lewellyn testified that in his opinion the body had been at the scene for two or three days. Bloodstains were found inside the abandoned building. No clothing was found at the crime scene. Defendant, Jeanell's boyfriend at the time and the man by whom she was approximately five months pregnant, lived about 150 to 175 feet from the crime scene.

Jeanell's mother, Mildred Bunn-King, told Detective Lewellyn that she had last seen her daughter alive on May 18, 1990, when

Jeanell was across the street from their home at her friend Judy's house. According to Jeanell's mother, Jeanell was wearing a bluish, aqua-colored top, black cut-off pants and a blue jean jacket and had plans for that evening with her boyfriend, the defendant.

Detective Lewellyn interviewed Anthony Mayfield and his sister, Kim Mayfield, who had been Jeanell's neighbors for many years. Anthony Mayfield told the detective that he had last seen Jeanell at 7 or 7:30 p.m. on May 18, 1990, when he saw Jeanell get into a yellow and brown station wagon which defendant was driving. At that time, Jeanell was dressed in an aqua-colored top, blue jean coat and pair of black cut-off pants. Kim Mayfield told Detective Lewellyn that she had last seen Jeanell alive on the evening of May 18, 1990, when she saw Jeanell leaving with defendant in a yellow and brown station wagon. Kim Mayfield said Jeanell had dinner plans with the defendant that evening.

Marcellis Johnson told Detective Lewellyn that he saw Jeanell between 5 and 6 p.m. on May 18, 1990. Marcellis said Jeanell was upset and crying and told Marcellis she had talked to defendant and they were not going out to dinner that evening. Marcellis said that Jeanell then walked down the street to her friend Judy's house.

Detective Lewellyn also interviewed Helena Johnson. Helena told the detective that on May 18, 1990, she spoke with Jeanell, who said she had dinner plans with the defendant that evening. According to Helena, on May 18, 1990, Jeanell was wearing a blue top, blue jean jacket and black cut-off pants. Helena said that the defendant and Jeanell often fought.

Detective Lewellyn and some fellow officers went to the defendant's home and spoke with defendant's father. Defendant was not at home, and the officers asked defendant's father to bring defendant to the police station when he returned home. As the officers were leaving, Detective Lewellyn noticed a yellow and brown station wagon parked on the street matching the description of the vehicle described by the witnesses. Inside the rear area of the vehicle, Detective Lewellyn observed a pair of black pants, an aqua, bluish-colored shirt and a blue jean coat. A registration check revealed that the station wagon was registered to the defendant.

The defendant came to the police station later that evening. Defendant was held for investigation for several days and was released without being charged.

In November 1990, Dr. John Kenney, the forensic odontologist for the Cook County medical examiner's office issued a report indicating that he believed the bite marks on the victim's body were caused by human dentition. The prosecution sought teeth impressions and

obtained a grand jury subpoena compelling defendant to produce certain evidence including fingerprints, palm prints, hair samples, saliva samples and dental impressions. Defendant supplied the requested samples without objection, though he did file a pretrial motion to suppress, which was denied.

Defendant first argues that the trial court erred in denying his motion to suppress the teeth and bite mark impressions he provided pursuant to the grand jury subpoena. Specifically, it is defendant's contention that the State should have been required to show probable cause in order for the grand jury to subpoena his dental impressions.

■ Through its subpoena powers, the grand jury is authorized to compel production of physical evidence. *In re May 1991 Will County Grand Jury*, 152 Ill. 2d 381, 389, 604 N.E.2d 929, 933 (1992). In Illinois, however, this power is limited by the fourth amendment's protection against unreasonable searches and seizures as well as the protection against invasion of privacy found in the Illinois Constitution. *Will County Grand Jury*, 152 Ill. 2d at 389-92, 604 N.E.2d at 933-35.

■ In *Will County Grand Jury*, the Illinois Supreme Court considered the federal and state constitutional limitations on the grand jury's power to subpoena physical evidence from an individual and established the following guidelines. Initially, there must be "[s]ome quantum of relevance *** established before a subpoena is issued for physical evidence." *Will County Grand Jury*, 152 Ill. 2d at 393, 604 N.E.2d at 935. This requirement is satisfied by a brief statement of the nature of the investigation. *Will County Grand Jury*, 152 Ill. 2d at 393, 604 N.E.2d at 935. Next, the type of intrusion caused by obtaining the requested evidence must be assessed. The greater the intrusion on the individual, the greater the showing of suspicion necessary to compel production. Where physical evidence of a nonintrusive nature is sought, some showing of individualized suspicion is necessary. *Will County Grand Jury*, 152 Ill. 2d at 393, 604 N.E.2d at 935-36. Accordingly, to compel an in-person appearance in a lineup, fingerprints, palm prints, voice or handwriting exemplars, the State must demonstrate relevance and individualized suspicion. *Will County Grand Jury*, 152 Ill. 2d at 393, 399, 604 N.E.2d 935-36, 938. Where, however, physical evidence of an invasive nature is sought, probable cause must be shown. Courts require a higher evidentiary showing for "invasive" evidence because obtaining such evidence violates an individual's physical integrity in that removal of the evidence from the body diminishes the body. *Will County Grand Jury*, 152 Ill. 2d at 399-400, 604 N.E.2d at 938-39. Accordingly, probable cause must be shown to issue a subpoena for hair or blood samples.

Based on *Will County Grand Jury*, we find that a showing of relevance and individualized suspicion is necessary for the grand jury to compel production of dental impressions. The taking of dental impressions falls in line with the category of noninvasive physical evidence described in *Will County Grand Jury* including lineups, fingerprints, palm prints, voice exemplars and handwriting exemplars. Unlike the cases where probable cause has been required, for example the taking of blood or hair samples, having dental impressions made does not involve an actual taking or removal of evidence from the body and does not violate an individual's bodily integrity by diminishing the body to any degree. In this case, as the demand for defendant's dental impressions was supported by both relevance and individualized suspicion, the grand jury subpoena was proper.

■ Defendant next contends that, during closing argument, the prosecutor misstated the evidence and unfairly attacked defense counsel, thereby depriving him of a fair trial. We disagree. It is well settled that improper prosecutorial remarks do not demand a reversal of a defendant's conviction unless they were so egregious as to undermine faith in the verdict. *People v. Cisewski*, 118 Ill. 2d 163, 175, 514 N.E.2d 970, 976 (1987). Even if we were to conclude that the prosecutor's comments were improper, the question of whether a new trial is warranted requires that we examine the prosecutor's comments in conjunction with the evidence properly presented against the defendant. On balance, if the evidence against the defendant outweighs any improper comment of a prosecutor, the error is considered harmless. *People v. McNeal*, 160 Ill. App. 3d 796, 803, 513 N.E.2d 897, 902 (1987). After reviewing the prosecutor's closing argument and the record as a whole, we find the evidence against defendant so overwhelming as to deem any alleged impropriety harmless.

For the reasons stated above, the judgment of conviction is affirmed.

Affirmed.

CERDA and GREIMAN, JJ., concur.