THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VERNON WATSON, Defendant-Appellant.

First District (1st Division)   No. 1—99—2606

Opinion filed April 28, 2003.

Rita A. Fry, Public Defender, of Chicago (Emily Eisner, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Mary L. Boland, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SMITH delivered the opinion of the court:

Following a bench trial, defendant, Vernon Watson, was found guilty of two counts of aggravated criminal sexual assault and one count of aggravated kidnapping. Prior to sentencing, the State petitioned the court to conduct an habitual criminal hearing pursuant to section 33B of the Criminal Code of 1961 (Habitual Criminal Act) (720 ILCS 5/33B (West 1998)). A hearing was conducted accordingly, after which defendant was declared an habitual criminal and sentenced to natural life in prison. From his conviction and sentence, defendant now appeals.

## FACTUAL BACKGROUND

Procedural History

The sexual assault in this case took place on May 15, 1989. The victim, C.A., was unable to see her attacker's face, nor could she identify him from a lineup or a voice lineup. DNA samples were obtained from the victim, defendant, and the victim's husband, J.A., and sent to the Federal Bureau of Investigation (FBI) laboratory in Washington, D.C., for testing, the results of which were questioned by defendant, who moved to exclude them from the evidence at trial.

A *Frye* hearing was held in 1991, after which the trial court ruled that while the methodology used in declaring a DNA match was generally accepted within the relevant scientific community, the procedures employed in calculating the statistical probability of a match, known as the product rule, were not. The court accordingly granted defendant's motion to exclude the results of the DNA testing.

The People took an appeal, and on January 28, 1994, this court vacated the trial court's ruling, directing it to consider an alternative method of calculating the statistical significance of a match, known as the "ceiling principle," and to make a determination with respect to its acceptance in the relevant scientific community. *People v. Watson*, 257 Ill. App. 3d 915 (1994).

The People filed a petition for leave to appeal, which was denied on October 6, 1994. *People v. Watson*, 157 Ill. 2d 519 (1994). The People then filed a motion to reconsider that denial, and a motion to consolidate the case with another case, *Franson v. Micelli*, 172 Ill. 2d 352 (1996), then pending before the Illinois Supreme Court. The court denied the motion to consolidate, but vacated its October 6, 1994, order and continued the matter on its docket. *People v. Watson*, 650 N.E.2d 1037 (1995). Eventually, the court denied the petition for leave

to appeal. *People v. Watson*, 168 Ill. 2d 621 (1996). The mandate was issued and the case returned to the trial court. On remand, the trial court granted the State's motion to reconsider the necessity of holding a second *Frye* hearing, in light of two recent supreme court decisions on the acceptability of the product rule. The court ruled that a second *Frye* hearing was unnecessary, and trial at last commenced.

The evidence presented at trial was as follows.

The Sexual Assault

In 1989, the victim was 24 years old and lived in the Beverly neighborhood of Chicago, with her husband, J.A. At the time, the victim worked in the Chicago Loop area and commuted to her job via the Metra line. At approximately 7:20 a.m. on May 29, 1989, the victim began the walk from her home to the train station at 99th Street. She recalled that the day was warm and sunny. She listened to a Sony Walkman as she proceeded.

As she approached the corner of 91st Street and Winchester, the victim saw a black male approximately four to five houses down Winchester, wearing a blue jogging suit and a gray hat. The man was jogging towards her.

She crossed at the intersection of 91st Street and Winchester and continued onto a cement footpath to the station, which ran through the Dan Ryan Woods. The area was well lit. When she was approximately halfway down the footpath, the victim was suddenly grabbed from behind around her shoulders and pulled backwards as a hand was placed over her mouth. She noticed that her attacker's hand was black and that he was wearing a dark blue nylon jogging jacket, with two red stripes down the sleeves.

The attacker told the victim that he had a pistol and would kill her if she screamed. He forcefully pushed her into the woods, away from the cement path and down a dirt path, from behind. She felt something hard on her back that she thought was a gun. Though she could not see her attacker's face, the victim sensed that he was a bit taller than her 5 feet 4 inches. As they went down the trail, he repeated several times that he would kill her if she screamed.

They traveled approximately 100 feet off the cement footpath and then stopped in a small clearing. Remaining behind her, the attacker removed his hands from the victim's mouth and demanded money. She gave him the money she had in her purse. He then demanded her jewelry, so she handed over her wedding bands and a ruby ring, along with her watch. The attacker pulled at the pearl necklace that was around her neck, causing it to break and the pearls to scatter.

The victim was then commanded to take off her clothes and to

place them into a blue tote bag she had been carrying. She undressed and placed her clothes in the bag as instructed. The attacker took from the victim the sweater that she had been wearing and, after pushing her down onto her back, he placed the sweater over her face and proceeded to have sexual intercourse with her. After he ejaculated, the attacker stood up. He told the victim to wait 10 minutes before rising and warned that, if she did not, he would return and kill her.

The victim waited just two to three minutes before getting up to find her clothes. The attacker at that point had disappeared. She wiped her vaginal area with her bra, which she did not put on, then donned her pants and sweater, and looked around for the rest of her belongings. She did not see her purse, her Walkman, her keys or her credit cards; the papers from her briefcase were strewn about. The victim left the scene as it was, for the police to find, and ran out of the woods.

She ran to a home at the corner of 91st and Pleasant Streets, though she did not know who lived there. Her knock on the front door was answered by Mrs. Martin, who took her in and called 911. The victim called her husband and her sister, then asked for permission to take a shower, which was granted. Following her shower, the victim dressed and went downstairs, where the police had just arrived. She spoke to the officers and told them that her attacker was black, between 20 and 30 years old, and approximately 5 feet 7 inches, and 140 pounds. She also related that he had been wearing a dark blue nylon sweat jacket, with two red stripes going down the outer sleeves, and a gray knit cap.

The victim was taken to the emergency department of Little Company of Mary Hospital, where she underwent a physical examination and testing. She was also questioned in greater detail about the attack by a detective, to whom she gave the same physical description of her attacker as she had given earlier.

Four days later, on May 29, 1989, the victim received a phone call from the detectives in this case, during which she was asked to come to the police station to view a lineup. She went, and although she got an "extremely bad feeling" when she saw defendant in the lineup, and noted that he was of the same height and build as her attacker, she could not positively identify him, not having seen his face. She was also asked to participate in a voice lineup, but did not recognize the defendant's voice, and instead mistakenly identified a Chicago police officer as being the voice of her attacker. She was very nervous at the time.

Pursuant to a police request, on July 7, 1989, the victim went back to Little Company of Mary Hospital to provide samples of her

blood and saliva for testing and comparison. Later that month, the victim's husband, J.A., submitted samples of his blood and saliva as well.

William McGlynn testified that he is an attorney and does criminal defense work in a private law firm. Prior to that, he was a Cook County assistant State's Attorney, and an assistant Attorney General, prior to which he was a Chicago police officer for 10 years.

In May 1989, McGlynn lived at 9100 S. Winchester, in the City of Chicago. On May 25, 1989, at approximately 7:30 a.m., McGlynn was waiting for his daughter to finish getting ready, so that he could drive her downtown to work. He was standing near his front door, looking outside into the street. McGlynn noticed a young man jogging down the middle of the street past him. This individual was black and wore a gray skullcap and a blue jogging suit with red stripes on it. This person caught McGlynn's attention in particular because May 25 was a very warm day, and this individual, though jogging in warm clothing, did not appear to be suffering from the heat. The person ran to within 30 feet of McGlynn.

McGlynn later drove his daughter downtown and made a court appearance. He was returning home in the early afternoon, when he noticed a commotion involving the police. He saw Detective Bill Egan, whom he knew from his time with the Chicago police, and asked Detective Egan what was going on. Detective Egan informed McGlynn that a girl had been attacked in the woods, and he gave to McGlynn a description of the individual they were looking for. McGlynn told him that he'd seen a person fitting that description and that he felt confident that he could identify that person from a lineup.

McGlynn was subsequently shown a photo array, which included a picture of defendant that had been taken 15 years earlier. From that array, McGlynn failed to identify defendant. He was later shown a photo array with a current picture of defendant, and from that array, he identified defendant as the individual he had seen on the morning of May 25. McGlynn additionally identified defendant from a lineup at the police station on May 29 as the same individual he had seen running past his house on the day of the attack.

Officer Rodney Schmitt testified that he responded to a call on the morning of May 25, 1989, pursuant to which he went to the home of Mrs. Martin. There, Officer Schmitt spoke to C.A., after which he sent out a flash message for the offender, identifying him as a male black, approximately 20 to 30 years of age, 5 feet 7 inches tall, 140 pounds and wearing a gray skull cap and a dark blue jogging suit with red stripes going down the side.

Detective William Egan testified that on May 25, 1989, at ap-

proximately 9:30 a.m., he was assigned to investigate a criminal sexual assault. Pursuant to that assignment, he went to Little Company of Mary Hospital in Evergreen Park, where he met with Officer Schmitt, and then the victim. The victim gave to Detective Egan a description of her attacker. He received the victim's clothing, which included a bra, pants, a sweater and a pair of tennis shoes, from medical personnel, placed the items in two brown paper bags, and gave them to Jeremiah Murray, an evidence technician.

Later that day, Detective Egan spoke with McGlynn, who told him he had seen an individual matching the attacker's description. Detective Egan additionally received a telephone call at home from Lieutenant Joseph Logue of the 22nd District. Lieutenant Logue informed him that several years previously, one of his sergeants had arrested a subject with the same "m.o." as in the victim's attack, in the same area. This individual had, just two to three weeks prior, been released from the penitentiary, having been convicted in the previous attack and having completed his sentence. Lieutenant Logue gave the name of defendant.

Detective Egan obtained from the officers of the 22nd District a photograph of defendant, taken in 1975, which he placed in a photo array and showed to McGlynn. McGlynn was not able to identify defendant from that array, but he did later identify defendant from a current photo that was part of a separate array.

Pursuant to McGlynn's identification of defendant from that array on May 29, Detective Egan went to 9328 S. Laflin, which was defendant's last known address. He obtained permission to enter and to speak to defendant, after which he took defendant to the police station where a lineup was conducted. At the station, defendant told Detective Egan that he was 32, stood 5 feet 8 inches tall, and weighed 143 pounds.

Forensic Evidence

Dr. Andrew Behl testified that he is an emergency room physician and was assigned to Little Company of Mary Hospital in May of 1989. On May 25 at approximately 10:15 a.m., Dr. Behl saw the victim following her sexual assault. He took from her a history and performed on her an internal and external physical exam. Dr. Behl also ordered lab tests, including a urinalysis and a gram stain of the cervix, both of which indicated the presence of sperm. Dr. Behl obtained an evidence kit, known as a sexual assault kit, into which he placed samples from the victim, including a hair specimen, swabs, and blood samples. This box would have been routinely sealed and then turned over to the police.

Chicago police officer Michael Pelka testified that he received the sealed evidence collection kit in this case from the emergency room of Little Company of Mary Hospital on May 25 and inventoried it for delivery to the lab.

On July 5, 1989, pursuant to a court order, Cermak Health Services technical manager Manuel Sanchez drew blood and took a saliva sample from defendant, who was accompanied by Detective Sue Raducha. Sanchez sealed the evidence in an envelope and gave it to Detective Raducha, who placed it in a plastic bag and took it to the crime lab.

Pamela Fish testified that she is a molecular biologist who, in 1989, was employed as a serologist by the Chicago police crime lab. On June 7, 1989, Fish received C.A.'s sealed sexual assault kit, along with two bags of her clothing, for the purpose of examining them for the presence of biological fluids, such as blood and semen. Fish conducted testing on the evidence, and discovered that C.A.'s pants and bra were both positive for the presence of semen and spermatozoa. After the testing was completed, Fish took extracts from the items to preserve them for future testing and returned them to the evidence and recovered property division for storage.

On July 5, Fish received blood and saliva samples taken from defendant. On these she performed ABO blood typing, which revealed that defendant is of blood type A. On July 8, Fish received blood and saliva samples from the victim on which she also performed ABO blood typing, which revealed that the victim is of blood type O.

On August 7, 1989. Fish received a written request to have the samples from this case sent to the FBI lab in Washington, D.C., for DNA analysis. Fish sent the samples to Hal Deadman at the FBI lab and asked him to perform DNA analysis on the blood standards from the victim and defendant, as well as on the semen stains that were identified on the bra, pants, and a swab.

On November 21, 1989, Fish was again on duty in the crime lab, and she received evidence[1] labeled as blood taken from J.A., the victim's husband. On this blood, Fish performed ABO blood typing, which revealed that J.A. is of blood type O. This standard was then sent to Hal Deadman at the FBI lab for analysis as well.

Fish testified that serological testing performed on semen stains found on the victim's bra and pants led her to conclude that defendant could not be excluded as a possible contributor to the seminal material on these items; J.A. could be excluded as a contributor as to each item.

Dr. Harold Deadman testified that he has a Ph.D in organic

---

[1]Three years was the statute of limitations on a charge of sexual assault.

chemistry. In 1989, Dr. Deadman was a special agent assigned to the FBI's DNA laboratory.[2] In August of 1989, Dr. Deadman began the examination of the items of evidence submitted in this case: cuttings from the victim's pants and bra and a swab each containing seminal fluid, and the blood samples from the victim and defendant. Later, Dr. Deadman obtained a blood sample from J.A. as well.

Dr. Deadman's testing led him to conclude, in January of 1990, that the statistical significance of the matches between the DNA of defendant and the DNA examined in this case was 1 in 90 million of the black population. Later testing conducted by Dr. Deadman on additional probes led him to declare a match in a reported frequency of 1 in 625 million.

Dr. Seymour Geisser testified that he is an expert in biostatistics.[3] Dr. Geisser was critical of the statistical methodology of the DNA profile frequency calculations. Dr. Geisser testified that the samples are potentially biased; the process ignores sampling errors; the use of the product rule is improper for statistically independent data; there is a lack of reporting in proficiency; the testing is not being done in a blind fashion; and the binning technique is flawed.

Dr. Geisser conceded that he himself had never conducted an RFLP analysis, nor did he independently analyze the data in this case. He acknowledged that the National Research Council II committee found nothing objectionable about the FBI's methods.

Destruction of Evidence

William Frost testified that he is an assistant State's Attorney who was formerly employed by the Chicago police department as the supervisor of the evidence and recovered property (ERPS) division. Frost was asked by the State's Attorney prosecuting this matter to look into the evidence relating to defendant's case and to gather tracers pertaining to that evidence.

He explained that a tracer is a form attached to each item of inventory sent to ERPS. Tracers are used in the ordinary course of business by the police to track the location of evidence. They contain instructions with respect to the disposition of the evidence, including whether and when the evidence is to be destroyed. In this case, Detective Egan

---

[2]Dr. Deadman was qualified as an expert forensic chemist able to make DNA comparisons at the *Frye* hearing that took place in this case in 1991. The parties stipulated to the testimony of that hearing, and the trial court took judicial notice of it.

[3]Dr. Geisser also testified at the *Frye* hearing, where he was qualified as an expert in biostatistics.

signed the tracers for the items recovered from the crime scene, for the bags of clothing, the victim's purse, and the sexual assault kit. Each of those tracers indicated that destruction was to take place after three years, unless ERPS was otherwise notified.[4] The blood and saliva samples were signed by Detective Raducha, who, at the time of trial, was deceased. Detective Wilkins, according to department policy, signed those tracers after Raducha's death. Those items were also marked for destruction following a three-year period.

Detective Egan testified that he did not know that DNA evidence would play a role in the prosecution of this case, nor had he ever worked on a case with DNA evidence at the time of his handling of the tracers at issue. None of the detectives in this case consulted the assistant State's Attorneys prior to signing the tracers.

Dr. Deadman testified that there was enough DNA in this leftover at the time of trial to retest.

Other Crimes Evidence

For its tendency to prove identity, the People sought to introduce evidence of a robbery and attempted rape that took place in September 1989, and an armed robbery and rape that took place in October 1980, both committed by defendant.

The 1980 incident took place near 88th Street and Longwood in the Beverly neighborhood of Chicago, as R.W. was walking to work. She entered a pathway and saw defendant jogging. As she continued on, he approached and grabbed her by the throat and pulled her farther into the woods. He picked up a large stick and threatened to injure R.W. if she did not comply. Defendant told her to disrobe and then had forcible intercourse with R.W. and robbed her of certain items, including a $100 case, a gold necklace, several rings and a bracelet. When defendant was arrested for that attack, he was wearing R.W.'s jewelry. It was for the assault on R.W. that defendant had been incarcerated from 1980 through 1989. He was approximately three weeks out of the penitentiary when the victim in the instant case was attacked.

The September 1989 incident took place at approximately 94th and Claremont Streets in the Beverly neighborhood of Chicago. The victim, K.B., was on her way to the Rock Island train station, from which she commuted to her job in the downtown area. Just after 6 a.m., she saw a black man walking across the street from her. She paid particular attention to him, because it was early in the morning for

---

[4]At the time, the statute of limitations on a charge of sexual assault was three years.

others to be out and because defendant was walking in the opposite direction from the train station.

Defendant crossed the street and approached K.B. He grabbed the front of her raincoat and warned her that if she screamed, he would kill her. He propelled her into an alley and told her to give him her money and her jewelry. K.B. handed over her wedding rings, her watch and earrings, and her electronic organizer. Defendant ordered K.B. to take off her clothes, and after she had removed her bra, he touched her breast. At that point, K.B. saw a light on in a nearby home, and she ran to it and pounded on the door. Defendant did not pursue her, and the police were called. K.B. had been able to see defendant and later picked him out of a lineup.

The trial court ruled that the 1989 attack would be admitted into evidence, but that the 1980 incident was too remote in time to be admissible.

Findings and Sentencing

At the close of evidence, defendant moved for a directed finding. This motion was denied without argument.

On May 4, 1999, the court found defendant guilty of two counts of aggravated criminal sexual assault and one count of aggravated kidnapping. Based on separate prior convictions for armed robbery and rape, the People sought to have defendant declared an habitual criminal. At the hearing, the People introduced a certified statement of conviction for armed robbery dated July 21, 1976, a certified statement of conviction for rape dated March 10, 1981, and a certified statement of conviction for aggravated criminal sexual assault, dated April 5, 1999.

The People also introduced the testimony of Officer Thomas Tansey, who testified in the case of R.W. of October 8, 1980.

The court found defendant eligible to be sentenced as an habitual criminal to life in prison. Defendant filed posttrial and postsentencing motions, both of which were denied.

In this appeal, defendant raises the following issues for our consideration: (1) whether the scientific evidence should have been suppressed where the State obtained blood samples not pursuant to a warrant but to a grand jury subpoena; (2) whether the destruction of the sex kit, the blood and saliva specimens and the victim's clothing violated defendant's right to due process; (3) whether the trial court's restriction of defense counsel's cross-examination violated defendant's right to due process; (4) whether the evidence proved defendant guilty beyond a reasonable doubt; (5) whether the admission of collateral crimes evidence was reversible error; (6) whether the trial court's

failure to conduct a second *Frye* hearing was in error; and (7) whether the natural life sentence under the Habitual Criminal Act was improper.

We consider each issue in turn.

I. Failure to Suppress the Scientific Evidence

Defendant contends that the scientific evidence in this case (the ABO typing and the DNA evidence) should have been suppressed where the State abused the power of a grand jury subpoena to compel him to donate blood, saliva and hair.

On June 1, 1989, defendant was served with a grand jury subpoena, in which he was instructed to accompany police officers to Little Company of Mary Hospital to provide samples of his head hair, pubic hair, saliva and blood. Although he accompanied the officers to the hospital as instructed, once there, defendant refused to sign a consent form, and the samples were not taken. On June 13, defendant was served with a second subpoena, calling for the same samples; this time he refused to go to the hospital at all. On June 29, the State petitioned the court for a rule to show cause as to why defendant should not be held in contempt for his refusal to comply with the grand jury subpoenas. On July 3, defendant was seized on a body attachment and brought before the chief judge to answer the rule to show cause. Again, defendant refused to provide the samples, and this time was jailed for contempt of court.

After two days, defendant purged himself of the contempt by consenting to the taking of the samples, a decision he contends was a result of the violation of his fourth amendment rights.[5]

Before the trial court in 1990, defendant filed a "motion to quash search warrant and suppress unlawfully seized evidence," in which he argued that since he was released prior to the issuance of the grand jury subpoena, there was no probable cause for its issuance and no basis for a search warrant, and thus the evidence was improperly seized. In 1998 when the issue was again raised by defendant, there was a discussion as to whether the evidence was seized pursuant to the grand jury process or the search warrant subsequently issued. The trial court permitted defendant to file a motion to quash his initial arrest, reasoning that the absence or presence of probable cause for that

---

[5]Just after entering the rule to show cause, the chief judge authorized a search warrant for the same evidence. There was no return on that warrant, which was never executed. The State conceded, before the trial court, that the samples were taken pursuant to the subpoena and not the warrant, and the trial court agreed, as does this court.

arrest affected the validity of the grand jury subpoena. Defendant filed the motion; it was heard and denied, as the trial court found that there was probable cause to support both the initial arrest and the grand jury subpoena.

Defendant now contends that even if there was probable cause for his initial arrest, a grand jury cannot subpoena blood, saliva and hair samples because a search warrant was required to collect the biological evidence. We consider first whether there was probable cause to support defendant's initial arrest.

■ Probable cause is "reasonable ground to believe that the suspect has committed, or is committing, a felony." *People v. Sims*, 167 Ill. 2d 483, 500 (1995). Police officers have probable cause to arrest a defendant when "facts exist that would lead a reasonable person standing in the shoes of the police officers to conclude that a crime has been committed and the defendant was the person who committed the crime." *People v. Robinson*, 167 Ill. 2d 397, 405 (1995). Probable cause is determined "according to the totality of the circumstances confronting the officers at the time of the arrest." *Sims*, 167 Ill. 2d at 500.

■ When the officers arrested defendant, they knew the following: the victim was attacked by a black male jogger, who was approximately 5 feet 7 inches, weighed 150 to 155 pounds, and wore a dark blue nylon jacket with red stripes and a gray skullcap; attorney William McGlynn, a former Chicago police officer and assistant State's Attorney, saw a male black jogger bearing the same physical description and wearing the same clothes just minutes before the attack in the area where it took place; McGlynn later identified that individual as defendant; Detective Egan learned from the 22nd District police that defendant had been released from the penitentiary a few weeks prior after having served time for a similar offense in the same area in 1980; and defendant was living less than a mile from where the attack took place. The trial court considered this evidence and determined that there was probable cause to support defendant's arrest. The motion to quash and suppress was accordingly denied.

A trial court's ruling on a motion to suppress is generally entitled to great deference, and this court will not disturb it on review unless it is against the manifest weight of the evidence. *People v. Smith*, 315 Ill. App. 3d 772, 775 (2000). In our view, based on the facts known to police in this case at the time of defendants' arrest, probable cause existed to believe a crime had been committed and that defendant committed the crime. Accordingly, we find the trial court's ruling on the motion to suppress was not against the manifest weight of the evidence.

We consider next whether blood, hair and saliva samples can be obtained via a grand jury subpoena.

■ The purpose of a grand jury investigation is both to exonerate individuals under suspicion of having committed a crime (*People v. Rodgers*, 92 Ill. 2d 283, 289 (1982)) and to establish the probable cause necessary for the arrest of suspected felons (*Phillips v. Graham*, 86 Ill. 2d 274, 284 (1981)). A specific charge need not be pending to trigger the grand jury's right to issue subpoenas; such a requirement would unduly trammel the investigation. *In re May 1991 Will County Grand Jury*, 152 Ill. 2d 381, 392 (1992), citing *People v. Allen*, 410 Ill. 508, 517 (1951).

■ Through its subpoena powers, the grand jury is authorized to compel the production of physical evidence. *Will County Grand Jury*, 152 Ill. 2d at 389. In Illinois, however, this power is limited by the fourth amendment's protection against unreasonable searches and seizures as well as the protection against invasion of privacy found in the Illinois Constitution. *Will County Grand Jury*, 152 Ill. 2d at 389-92. The greater the intrusion on the individual, the greater the showing of suspicion that will be necessary to compel production. *Will County Grand Jury*, 152 Ill. 2d at 393. Where physical evidence of an invasive nature is sought, probable cause must be shown. *Will County Grand Jury*, 152 Ill. 2d at 399-400; *People v. Payne*, 282 Ill. App. 3d 307, 310 (1996). Accordingly, our inquiry is whether the grand jury subpoena issued in this case that called for the hair, blood and saliva of defendant was supported by probable cause.

As we have determined, the information available to police at the time of defendant's initial arrest was sufficient to support a finding of probable cause. Defendant was subsequently released from custody pending further investigation. The grand jury proceedings that resulted in the challenged subpoena took place approximately two months thereafter. Defendant argues that the same probable cause that supported his initial arrest cannot also support the grand jury subpoena, since the decision to release him from custody following the initial arrest was tantamount to a finding that probable cause no longer existed.

■ It is true that to justify a present search, probable cause must be current and not rest upon facts that existed in the past, unless there is a reason to believe those facts are still in existence. *People v. Thompkins*, 121 Ill. 2d 401 (1988). Nevertheless, there is no arbitrary cutoff period that can be expressed in days or weeks beyond which probable cause ceases to exist. See, *e.g.*, *Thompkins*, 121 Ill. 2d at 435-36 (there was probable cause for search warrant for bloodstains on a concrete floor 83 days after murder).

■ In this case, it was confirmed after defendant's initial arrest by Pamela Fish's testing that spermatozoa was present in the urinalysis and gram stain obtained from the victim, and that these samples were

in turn suitable for comparison tests. The grand jury could well have concluded, based on the information known to police at the time of defendant's initial arrest, that a sexual assault took place and was committed by defendant and, based on the information that spermatozoa suitable for comparison was taken from the victim, that probable cause existed to order its comparison with samples from the defendant. We find this conclusion to have comported with the manifest weight of the evidence.

Because we find that there was probable cause to support the grand jury subpoena, the fact that the subpoena called for blood, hair and saliva samples was not improper or otherwise in violation of fourth amendment principles. *Will County Grand Jury*, 152 Ill. 2d at 399-400.

## II. Destruction of Evidence

Material in this section and in sections III through V is nonpublishable under Supreme Court Rule 23.

## VI. Failure to Hold a Second *Frye* Hearing

Defendant next contends that the trial court violated the "law of the case" doctrine in failing to hold a second *Frye* hearing upon remand, in accordance with this court's mandate in *People v. Watson*, 257 Ill. App. 3d 915 (1994).

Following the original *Frye* hearing in this case, in February and March of 1991, the trial court ruled that, while the methodology used in declaring a DNA match was generally accepted within the relevant scientific community, the procedure employed in calculating the statistical probability of a match, specifically, the product rule, was not. Accordingly, the court granted defendant's motion to exclude the results of the DNA testing. The State took an appeal, and in its decision, this court agreed with the trial court's finding that the FBI's RFLP matching technique is generally accepted in the relevant scientific community. As to the suppression of evidence based on the lack of acceptance for the product rule as a means of calculating statistical significance, this court vacated the trial court's ruling and directed it to hold a second *Frye* hearing to consider the scientific acceptance of the "ceiling principle" method instead.

A series of State appeals followed, culminating in remand to the trial court nearly three years later. At that time, the State made a motion to reconsider the necessity of holding a second *Frye* hearing in light of the recent decisions of the supreme court in *People v. Miller*, 173 Ill. 2d 167 (1996), and *People v. Hickey*, 178 Ill. 2d 256 (1997), which gave approval to the product rule as a method of calculating the

statistical significance of a DNA match. After considering the applicability of the two decisions, the trial court found that they were dispositive of the issue and granted the State's motion.

■ While a trial court is normally bound on remand by this court's disposition of questions of law, there is an exception to the "law of the case" doctrine where a higher reviewing court, subsequent to the lower reviewing court's decision, makes a contrary ruling on the same issue. *People v. Melka*, 319 Ill. App. 3d 431, 438-39 (2000).

In *Miller*, the supreme court rejected the defendant's argument that DNA evidence based on calculations using the product rule was erroneously admitted in light of the holding in *Watson*. Though acknowledging the existence of the holding in *Watson*, the court in *Miller* found that the controversy over the product rule was dissipating with the evolution of the science. The court further pointed out that "[t]he most recent courts to consider the use of the product rule have concluded that it is a generally accepted statistical method for estimating the frequency of a DNA match." *Miller*, 173 Ill. 2d at 189. Thus, the court in *Miller* held that the trial court properly relied on the evolution of the science rather than the decision in *Watson* in permitting the expert to testify on the DNA analysis.

After *Miller*, the supreme court decided *Hickey*, in which it reaffirmed its views with respect to the scientific acceptance of the product rule as a method of calculating the statistical significance of a match, stating that "nothing has occurred in the short time since our decision in *Miller* was issued which would cast doubt upon the results reached in that case. To the contrary, recent developments in the scientific community indicate continued support for the use of RFLP profiling and for the use of the product rule." *Hickey*, 178 Ill. 2d at 278. The court took particular notice of the NRC's 1996 report (an update to its 1992 report), in which it was concluded that "[t]he state of the profiling technology and the methods for estimating frequencies and related statistics have progressed to the point where the admissibility of properly collected and analyzed DNA data should not be in doubt." National Research Council, The Evaluation of Forensic DNA Evidence, Committee on DNA Forensic Science: An Update 36 (National Academy Press 1996) (NRC II). The court further noted that the update specifically concludes that sufficient data have been gathered to establish that the interim ceiling principle is not needed and further recommends that, in general, the calculation of a profile frequency should be made with the product rule. *Hickey*, 178 Ill. 2d at 278-79, citing NRC II at 5, 35-36.

■ Defendant insists that neither *Miller* nor *Hickey explicitly* overruled *Watson* and, thus, *Watson* remained the law of the case for purposes of the trial court's actions. We find this argument unpersua-

sive. In fact, this court has already specifically recognized that the *Miller* court held that *Watson* is no longer controlling as to the use of the product rule and that, in light of scientific developments, the use of the product rule is now accepted and proper. See *People v. The Almighty Four Hundred*, 287 Ill. App. 3d 123, 130 (1997). We agree and thus hold that, in light of the change in the law exception to the law of the case doctrine (see *People v. Daniels*, 332 Ill. App. 3d 198, 210 (2002)), the trial court in this case was not bound by the mandate of *Watson* and properly granted the State's motion to not hold a second *Frye* hearing.

VII. Sentencing

The material in this section is nonpublishable pursuant to Supreme Court Rule 23.

Conclusion

We hold that the trial court did not err in any of the respects urged by defendant and accordingly affirm the trial court's judgment, which found defendant guilty of aggravated criminal sexual assault and aggravated kidnapping. We further hold that no error occurred in the trial court's adjudication that defendant is an habitual criminal under the relevant statute, and thus defendant was properly sentenced to life in prison.

Affirmed.

GORDON, P.J., and McNULTY, J., concur.