2026 IL App (1st) 240128-U
No. 1-24-0128

SIXTH DIVISION
May 8, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *In re* COMMITMENT OF ANTONIO WILLIAMS | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 11 CR 80012 |
| v. | ) | |
| | ) | |
| Antonio Williams, | ) | The Honorable |
| | ) | James B. Novy, |
| Respondent-Appellant.) | ) | Judge, presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice C.A. Walker and Justice Gamrath concurred in the judgment.

**ORDER**

¶ 1    *Held:* We affirm the trial court's judgment entered upon a jury trial finding respondent to be a sexually violent person and the court's order committing him to institutional care in a secure facility where the State's closing and rebuttal arguments were proper. We further find that the court did not err in failing to *voir dire* the jury regarding possible juror misconduct.

¶ 2    Following a jury trial, respondent Antonio Williams was found to be a sexually violent person pursuant to the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq*. (West 2010)). After a dispositional hearing, the court ordered Williams to be committed to a secure facility for treatment. On appeal, respondent contends the State committed prosecutorial

misconduct during its closing arguments, and the trial court erred by not questioning jurors about falling asleep during testimony. For the following reasons, we affirm.

## I. BACKGROUND

On May 31, 2011, the State filed a petition to commit respondent as a sexually violent person under the Act. According to the petition, respondent had been convicted of aggravated criminal sexual abuse and aggravated criminal sexual assault in case numbers 05 CR 15937 and 91 CR 17851 and sentenced to terms of 12 and 14 years' imprisonment, respectively.

The State attached the report of Dr. Deborah Nicolai, a clinical psychologist. Using the Diagnostic and Statistical Manual of Mental Disorders (DSM), 4th Edition, DSM-IV (DSM-IV), Dr. Nicolai diagnosed respondent with (1) paraphilia, not otherwise specified, sexually attracted to non-consenting females (OSPD nonconsent); and (2) antisocial personality disorder. She opined that respondent met the criteria for this diagnosis as he "has evidenced recurrent sexual urges and behaviors that involved non-consenting females." His first known sex offense occurred when he was 18 years old, and his last known sex offense, for which was convicted, took place when he was 32 years old. At the time of the report, respondent had a history of "very limited participation" in treatment as he did not complete sex offender treatment in the Illinois Department of Corrections (IDOC) or in outpatient treatment services. Dr. Nicolai recommended that respondent be found to be a sexually violent person under the Act and thus recommended him for civil commitment.

### A. Jury Trial

#### 1. State's Case-in-Chief

The matter proceeded to a jury trial in May 2023. The State presented Doctors Steven Gaskell and Mark Kuzia, a forensic and clinical psychologist, respectively. Respondent called clinical psychologist Dr. Brian Abbott. Each was qualified as an expert in sex offender evaluation.

The doctors interviewed respondent and examined his Department of Corrections (DOC) "master file," including police records, court documents, medical files, and records from other institutions.

¶ 8 Dr. Gaskell testified that he interviewed respondent in December 2011 and concluded that he met the criteria to be a sexually violent person. Since his initial interview, Dr. Gaskell completed updated evaluations in April 2020 and April 2023, as respondent had been in a treatment and detention facility (TDF) since the initial evaluation. As of the second updated evaluation, he found that respondent still met the criteria to be a sexually violent person. Respondent's criminal history ranged from 1990 to his most recent convictions in case number 05 CR 15937. Considering nonsexual criminal offenses as well, respondent had "17 events where he was charged with a crime," including 5 incidents where he was violent toward women. He also continued to engage in criminal acts during probation or parole.

¶ 9 When respondent was 18 years old, he restrained his 11-year-old female cousin on her bed and forced vaginal intercourse while she screamed and attempted to flee. He ejaculated inside her. The victim recanted her testimony during the trial, but respondent was nevertheless found guilty of aggravated criminal sexual assault and sentenced to 14 years' imprisonment. Respondent was released from custody in 1998 and violated his probation "at least" three times by 2005. Seven months after his release from prison, respondent strangled a woman whom he had met that day and had sexual intercourse with her against her will. Respondent then pled guilty to aggravated criminal sexual abuse and was sentenced to 12 years' imprisonment. Respondent also choked a female victim during a domestic battery in 2002.

¶ 10 While in prison for his first conviction, respondent had "significant behavior problems," including fighting and threatening other inmates. These issues were not present during his second period of imprisonment. When respondent was transferred to the TDF in 2011, he exhibited "very

problematic behavior" such that he received "15 major rule violations" and "31 minor rule violations," and was involved in "at least" 4 fights, during one of which he choked another resident. Respondent also engaged in "manipulative grooming" with the facility's staff and displayed "extremely poor boundaries with female staff," including one incident of stalking female staff members in 2013. The staff attempted to stop this behavior, but respondent continued to be inappropriate "verbally and behaviorally" with female staff. Due to his behavior, respondent was placed on "male escort status" through the facility protect the female staff members. A "very small" number of residents in the facility are on male escort status at any given time.

¶ 11        According to Dr. Gaskell, the Act defines "mental disorder" as a "congenital or acquired condition impacting a person's emotional or volitional capacity," which predisposes them to "commit future acts of sexual violence." Dr. Gaskell diagnosed respondent with OSPD nonconsent and antisocial personality disorder. Respondent met the criteria for OSPD nonconsent because his first offense was in 1991 against an 11-year-old who was nonconsenting, and his second offense was in 2005 against a 15-year-old who was nonconsenting. Regarding the second offense, respondent stated that he "messed up" and offended against her because he "snapped," which suggested a lack of control. Respondent's lack of control was also evident in his treatment of female staff members in the TDF, including one incident of exposing himself to staff. Dr. Gaskell opined that OSPD nonconsent is a "chronic" disorder that can be managed with treatment but does not "go away on its own."

¶ 12        Respondent also met the criteria for antisocial personality disorder because he has shown a "reckless disregard for the safety of others" and had a history of physical assaults in addition to the sex crimes at issue. Respondent also behaved deceitfully by repeatedly lying and using aliases. Like OSPD nonconsent, antisocial personality disorder is a "chronic and often lifelong disorder."

According to Dr. Gaskell, respondent's disorders impact his decision-making abilities, such that he is unable to consider the consequences of his actions.

¶ 13    Dr. Gaskell assessed respondent's risk of recidivism using actuarial instruments Static-99R and Static-2002R. Respondent scored in the highest risk category under the Static-99R and the second highest risk category under the Static-2002R. Respondent also had 11 dynamic risk factors associated with increased risk to reoffend, which represented "a dangerous combination of sexual deviant factors and antisocial personality factors" as well as "noncompliance with supervision."

¶ 14    Defendant was 50 years old, which reduced his risk to reoffend "to some degree." This factor was reflected in the actuarial instruments' analysis. However, no other protective factors for decreased risk to reoffend applied. Specifically, no reduction was related to his progress in sex offender treatment. Dr. Gaskell opined, within a reasonable degree of psychological certainty, that respondent was "substantially probable to commit future acts of sexual violence."

¶ 15    On cross-examination, Dr. Gaskell stated that respondent was "pleasant, polite, and cooperative" during the 2011 interview, and that he did not attempt to interview respondent again in 2020 and 2023. Although respondent "consistently denied" his 1991 offense to evaluators, notes from DOC from 1998 establish that respondent admitted to "fondling [the victim's] breast, restraining her, and having sexual intercourse with her." When respondent was in IDOC, he received no violations for sexual misconduct. Respondent also never received any "sexual misconduct" violations during his time at the TDF, although he received multiple violations for "inappropriate boundaries with female staff" and one minor rule violation for "exposing himself." Dr. Gaskell also noted one incident where respondent was "stalking" female staff in 2013 but acknowledged that he did not include that in his rationale for diagnosing respondent with OSPD nonconsent.

¶ 16 Dr. Gaskell then answered questions regarding the actuarial instruments, and how they predict respondent's risk of recidivism. Soon after, the court took an afternoon break and excused the jury. During the break, defense counsel informed the court that "two jurors [were] closing [their] eyes" but was unsure whether they were sleeping. The court acknowledged that it would admonish the jury but wanted to "give them the benefit of the doubt" before questioning them as to whether they fell asleep. It also noted that it did not see any sleeping jurors. When the jury returned, the court stated the following: "I would appreciate if anyone is having an issue maintaining th[eir] attention to let myself or the deputies know and we'll take a break to refresh yourselves and come back because it's important that everybody is listening to everything being said during the trial."

¶ 17 On redirect examination, Dr. Gaskell testified that denial, or not accepting accountability, is the "number one problem" for persons charged with sexual offenses and sexually violent persons.

¶ 18 Dr. Kuzia testified that he interviewed respondent on January 20, 2023, and determined that respondent met the criteria for a sexually violent person. In March 2007, respondent was convicted of aggravated criminal sexual abuse and sentenced to 12 years' imprisonment. The facts of the offense established that respondent sexually assaulted a 15-year-old girl, who his brother had introduced to him earlier in the day. The victim lived in the same apartment complex as respondent's brother. On the day of the incident, respondent entered her apartment without her consent and used her bathroom. She told him that her mother would be home in "five minutes," but he grabbed her and laid her down on the bed where he choked her and forced sexual intercourse. Respondent went to his brother's apartment and told his brother and his brother's fiancée, "I f*** up *** I f*** up with a 17 year old." Later, respondent's brother spoke with him by telephone and

asked why he offended, to which respondent stated, "I snapped." Four days later, respondent reported that the incident was consensual, but the victim told him not to ejaculate inside her and became angry when he did so.

¶ 19     Dr. Kuzia reviewed respondent's entire criminal history and noted respondent's "repeated" violations of probation, parole, or supervision. Additionally, during his time at the TDF, respondent engaged in one incident of "manipulative grooming" where he asked a female staff member if she had been "lifting weights because she looked different in the back" and winked at her. Later, she was using a computer, and he made a comment to her that she "enjoyed sliding around on everything." Respondent informed Dr. Kuzia that the comment wasn't meant to be sexual and referred to the chair. Dr. Kuzia also outlined other incidents where respondent requested that a male staff member bring him pornography and where he told female staff that he was attracted to them.

¶ 20     Dr. Kuzia opined that respondent met the criteria for OSPD nonconsent and antisocial personality disorder, and these disorders predisposed him to acts of sexual violence because he did not have the ability "to check himself" regarding his urges. Dr. Kuzia also performed a risk assessment with the Static-99R and Static-2002R actuarial instruments. Dr. Kuzia scored respondent as a 4 or 5 under the Static-99R evaluation, which was above average risk level. A score of 4 corresponds to 1.9 times more likely to commit a sex offense than the average offender, and a score of 5 corresponds to 2.7 times more likely to do so. Dr. Kuzia also scored respondent as 5 under the Static-2002R instrument, corresponding to 1.9 times more likely to commit an offense than an average offender. Dr. Kuzia also noted dynamic risk factors, including deviant sexual interests, noncompliance with supervision, lack of intimate emotional relationships, and lifestyle impulsivity.

¶ 21    On cross-examination, Dr. Kuzia stated that the dynamic risk factors do not increase respondent's risk but rather have "predictive utility in understanding the risk." Dr. Kuzia acknowledged that no diagnostic criteria for OSPD nonconsent existed under the current DSM, fifth edition (DSM V-TR), and OSPD nonconsent was rejected for inclusion in the DSM-V-TR. Additionally, older sex offenders are at a lower risk to reoffend than younger sex offenders.

¶ 22    The State introduced stipulations that respondent was convicted of aggravated criminal sexual assault in case number 91 CR 17851 and sentenced to 14 years' imprisonment, and that he pled guilty to aggravated criminal sexual abuse in case number 05 CR 15937 and was sentenced to 12 years' imprisonment.

¶ 23                    2. Respondent's Case-in-Chief

¶ 24    Respondent called Dr. Abbott, who testified that when he traveled to Illinois to perform evaluations, he preferred to do the vast majority of them in Cook County, in part because he liked to visit Chicago. Dr. Abbott interviewed respondent several times from 2018 to 2023 and concluded that respondent did not meet the criteria to be a sexually violent person. He noted that respondent's two sexual offenses separated by 14 years, combined with other types of criminal behavior, established that his sex offending behavior was "part and parcel" of his antisocial personality disorder rather than a paraphilic disorder. Further, respondent suffered from antisocial personality disorder "by history," but no longer suffered from it when Dr. Abbott interviewed him in 2018, as he only exhibited one symptom at that time: lack of remorse. By the time Dr. Abbott interviewed him in 2020 and 2023, his "behavioral adjustment had improved" and he no longer exhibited lack of remorse. Additionally, his behavior problems lessened over time while he was in custody, which was consistent with "the condition remitting." Dr. Abbott opined that respondent's

"occasional behavioral problems," which were related to his handling "institutional frustrations," did not substantiate that he still suffered from antisocial personality disorder.

¶ 25    Dr. Abbott was familiar with OSPD and noted that it appeared in the DSM as a "placeholder category" for any paraphilic diagnosis that was not listed among the eight specified in the DSM. The OSPD category does not include criteria, differential diagnoses, or information on the prevalence of the disorder. Dr. Abbott opined that the lack of this information supported the contention that OSPD nonconsent was not a valid diagnosis. He also opined that respondent did not suffer from OSPD nonconsent based on the limited evidence in support of the conclusion.

¶ 26    Dr. Abbott also assessed his risk using actuarial instruments, based on the "hypothetical" that respondent suffered from a mental disorder, and determined that such hypothetical mental disorder would not make him substantially probable to engage in acts of sexual violence. Dr. Abbott scored respondent as a "6," which was in the "well above risk" or "nominal risk" category, under the Static-99R instrument. According to Dr. Abbott, "[t]he nominal risk category does not provide any useful information in addressing whether someone is substantially probable" to reoffend, so it was unhelpful. With a score of 6, "the five-year recidivism rate is 17.6 percent and the margin of error is 16 percent to 20 percent." Dr. Abbott also noted that the Static-99R underestimates risk "to a certain extent."

¶ 27    Dr. Abbott did not use either instrument for assessing structured dynamic risk factors because "neither were indicated in [respondent's] case" as he did not meet a certain level of treatment.at the TDF. Dr. Abbott noted that a single risk factor would not be able to assess the degree of risk, and combining factors risks "implying a higher level of risk" because the risk factors were redundant.

¶ 28    During Dr. Abbott's direct examination, prior to his testimony regarding the content of his evaluations, the attorneys had a sidebar with the court off the record. After which, the court admonished the jury again, noting that "attentions are starting to wane" and asking if anybody "doesn't feel like they can continue" due to being too tired. The court then continued the examination.

¶ 29    On cross-examination, Dr. Abbott stated that he was chosen by respondent's counsel prior to being appointed by the court and was paid by the hour. Dr. Abbott was also reimbursed for his travel expenses. He agreed with the State's characterization that "all" of the evaluations regarding sexually violent persons that he has performed in Illinois have been for the "defense." According to Dr. Abbott, OSPD is in the DSM-V-TR to describe an "identifiable paraphilia" which is not among the eight specified paraphilias in the manual. However, Dr. Abbott did not believe that OSPD non-consent, as identified here, was a valid mental disorder. For a person with antisocial personality disorder, like respondent, "it was a voluntary choice on his part to commit those sex offenses" rather than a lack of control over his actions. Respondent did not express remorse for raping either victim in his criminal cases, but Dr. Abbott found that he no longer lacked remorse to establish antisocial personality disorder based upon more than the two incidents. Dr. Abbott acknowledged the rule violations respondent received in the TDF from 2014 to 2022, including those where he was inappropriate with female staff members and his being placed on male escort status.

¶ 30    Dr. Abbott scored respondent as a 6 using the Static-99R actuarial instrument, which represented the highest risk category on the instrument. Additionally, although the Static-99R coding rules provide that an evaluator should consider dynamic risk factors, Dr. Abbott found that they did not apply to respondent's situation.

¶ 31     On redirect examination, Dr. Abbott testified that he had an ethical obligation to meet with the individual he evaluated and assess their mental status to provide accurate opinions regarding their mental state and that he did not update his reports in 2021 and 2023 "just to make money."

¶ 32                                3. Closing Arguments

¶ 33     Prior to closing arguments, the court instructed the jury that:

> "[w]hat the attorneys say during the arguments is not evidence and should not be considered by you as evidence. If the attorney makes a statement that is not based on the evidence or a reasonable inference to be drawn from the evidence, you should disregard the statement. You are only to rely on your own recollection of the evidence."

¶ 34     In closing, the State argued that Doctors Gaskell and Kuzia opined that respondent had OSPD with an attraction to non-consenting women and antisocial personality disorder, and that these disorders affected his emotional or volitional capacity. The State emphasized "pervasive pattern of the disregard for and violation of the rights of others," which was consistent with his criminal history and multiple infractions received in the TDF. The State discussed the facts of respondent's criminal offenses when noting this "pattern" or "script" described by Dr. Kuzia and his predisposition toward acting with a lack of control. It also noted that respondent's time in therapy did not improve his behavior as he continued to harass female staff workers.

¶ 35     Respondent's counsel contended, *inter alia*, that every expert witness who testified was being paid to do so, but Dr. Abbott was "by far" the most qualified expert. Respondent's counsel argued that Doctors Gaskell and Kuzia were not credible, in part due to their demeanor in answering questions during cross-examination and because they misremembered facts related to respondent's convictions and incidents in the TDF. He argued that during their testimonies, Doctors Gaskell and Kuzia "start[ed] making more stuff up" that was not in their reports in order

to convince the jury to find respondent to be a sexually violent person. Respondent's counsel also asserted that Dr. Kuzia was biased and was following "a script."

¶ 36       In rebuttal, the State argued, in relevant part, over respondent's counsel's objection, that Dr. Abbott "will not take a case if he thinks the person is [a sexually violent person] because then he doesn't get paid" or get to "fly down to Chicago." Regarding respondent's counsel's comments about a supposed "conspiracy" to find that respondent was a sexually violent person, the State commented that "the ironic thing is that it actually fits the narrative for the expert who you saw testify in a $5,000 suit with the fancy pocket squares and everything." The court sustained respondent's counsel's objection to this statement.[1] The State further argued that whenever a State evaluator determines OSPD nonconsent is present, "Dr. Abbott gets to get on the case and get paid hundreds and hundreds and thousands of dollars to find the other way." The State remarked that Dr. Abbot's testimony in the case was a "free advertisement" to defense attorneys that he would "regurgitate the same manufactured opinion" that he gave for respondent. The State contended that Dr. Abbott was biased and noted the severity of the issues presented in the case. The State commented that the risk present was "the risk that there is another victim whose life is changed forever from being the victim of rape." The court sustained respondent's counsel's objection to this statement. The State concluded by commenting that "[t]he common sense, the evidence in this case, everything points to one conclusion, and it is that if this man is released from custody, there will be another victim."

¶ 37                          4. Verdict and Posttrial Motions

---

[1] Prior to trial, the court instructed the jury regarding general principles of laws, including that if it sustained an objection, the jury was to disregard the question and answer given.

¶ 38    The court instructed the jury that, *inter alia*, if an attorney's statement during closing arguments was not supported by the law or the evidence, it should disregard that statement.

¶ 39    After the jury retired to deliberate, respondent's counsel moved to remove a juror who had allegedly been sleeping two times during the trial. The court denied the motion, commenting that it did not see anyone sleeping, and it had paid "close attention" to the jury. Respondent's counsel also moved for a mistrial, in part due to the State's appeal to the sympathy of the jury by commenting that the case involved "a sexual assault victim whose life is going to be changed forever if they don't find [respondent] to be" a sexually violent person. The court denied the motion, noting that the State's conduct was nowhere "near the level that would give rise to a mistrial."

¶ 40    The jury found respondent to be a sexually violent person under the Act. Respondent subsequently filed a motion and amended motion for a new trial, arguing in part that the court erred in denying his motion to question the jurors regarding whether they were sleeping or remove the juror who had fallen asleep. Respondent also argued that the trial court erred in denying respondent's motion for a mistrial due to the State's closing argument comments. The court denied respondent's motion.

¶ 41    On December 21, 2023, after a dispositional hearing, the court entered judgment on the verdict and committed respondent to the custody of the Department of Human Services (DHS) for institutional care in a secure setting until further court order.

¶ 42                                    II. ANALYSIS

¶ 43    On appeal, respondent argues that the State committed prosecutorial misconduct during closing arguments when it (1) argued that there would be "another victim" if the jury did not find respondent to be a sexually violent person, (2) improperly used the facts of respondent's two

convictions as substantive facts rather than as the basis for the experts' opinions, and (3) disparaged and denigrated Dr. Abbott's character. Respondent also argues that the trial court erred where it did not question the jurors regarding falling asleep.

¶ 44                     A. Prosecutorial Misconduct in Closing Arguments

¶ 45        During closing argument, prosecutors have a great deal of latitude to comment upon and draw reasonable inferences from the evidence presented. *People v. Blue*, 189 Ill. 2d 99, 127 (2000). A prosecutor may comment on any reasonable inferences taken from the evidence "even if those inferences reflect negatively on the [respondent]," and on those matters "implicated by [respondent's] counsel." *People v. Williams*, 2022 IL 126918, ¶ 44. Closing arguments must be viewed in their entirety, and the allegedly improper argument must be considered in context. *Blue*, 189 Ill. 2d. at 128. In reviewing comments made during closing arguments, we ask whether the comments "engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilty resulted from them." *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007).

¶ 46        With respect to preserved errors regarding an alleged improper argument, we use a two-step process to consider whether a trial court's decision to overrule a defendant's objection to a comment in closing argument is reversible error. *Williams*, 2022 IL 126918, ¶ 41. The court must first consider whether the comment was improper, and if so, must then determine "whether the improper comment was so prejudicial that real justice was denied or the verdict resulted from the error." *Id*. The trial court's decision to overrule an objection to a comment in closing argument is reviewed for an abuse of discretion. *Id*.

¶ 47        Respondent first challenges the State's comment that the case presented "the risk that there is another victim whose life is changed forever from being the victim of rape." He acknowledges

that the court sustained his objection to the comment but contends that the State continued to press this point by concluding, "[t]he common sense, the evidence in this case, everything points to one conclusion, and it is that if this man is released from custody, there will be another victim." Although respondent did not preserve the argument related to this statement, we may review the issue for plain error under the criminal plain error doctrine. See *In re Commitment of Tenorio*, 2020 IL App (1st) 182608, ¶ 50 (applying criminal plain error to a civil commitment case).

¶ 48    The criminal plain error doctrine allows a reviewing court to consider an unpreserved claim where a clear and obvious error occurred and (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, or (2) the error is so serious that it affected the fairness of the trial and challenged the integrity of the judicial process. *People v. Sebby*, 2017 IL 119445, ¶ 48. The first step of the review is to determine whether there was a clear or obvious error at trial. *Id*. ¶ 49.

¶ 49    The court sustained respondent's counsel's objection to the State's comment regarding the likelihood that another victim's life would be "changed forever" due to rape, after it had instructed the jury to disregard questions and answers to which it sustained an objection. Doing so cured any "improper inference" derived from the State's improper comment. See *People v. Bannister*, 232 Ill. 2d 52, 91 (2008) ("[A]ny improper inferences from the prosecutor's comments were cured by the trial court sustaining defense counsel's objections and the court's instructions to the jury to disregard comments to which objections were sustained."). Respondent argues that the State essentially nullified the cure when it commented that the "common sense" conclusion established

that "there will be another victim" if the jury did not find respondent to be a sexually violent person as that argument was "improper" and "not supported by the evidence."

¶ 50    We disagree. First, the statement concluding the likelihood that there would be another victim is a reasonable inference from the evidence, as much of the experts' testimony related to the use of actuarial instruments to estimate respondent's likelihood of reoffending. See *Williams*, 2022 IL 126918, ¶ 44. Additionally, the sole remark was "fleeting" in the context of the argument, and the court instructed the jury that closing arguments are not evidence and it should disregard any arguments which were not based on the evidence. See *Bannister*, 232 Ill. 2d at 92 (considering the number of allegedly improper statements regarding a topic as well as whether the jury was instructed that closing arguments are not to be considered evidence). Thus, we find no error in the State's argument regarding this issue. As there is no error, there can be no plain error. See *Sebby*, 2017 IL 119445, ¶ 49.

¶ 51    Next, respondent challenges the State's use of the "graphic" details of respondent's two prior sexual convictions as "substantive facts" during its closing argument. He contends that the State's focus on the facts of respondent's convictions established that it used such facts as "facts" or "evidence" rather than the basis for the experts' opinions. Respondent preserved the issue by objecting to the State's reference to the "opinion" testimony.

¶ 52    An expert "is permitted to testify" regarding opinion testimony, but "the underlying facts or data are admitted for the limited purpose of explaining the basis for the expert's opinion, and the basis of an expert's opinion must not be presented to the jury as substantive evidence of the underlying assertions." *Tenorio*, 2020 IL App (1st) 182608, ¶ 44. Here, although the State referenced the facts underlying respondent's convictions, it did so when describing the experts' conclusion that he displayed a "pattern" regarding nonconsensual sex with women and disregard

for the rights of others. Here, the remarks do not establish that respondent was on trial for his past offenses and were used to illustrate the pattern of behaviors which led the experts to their diagnoses. See *id*. ¶¶ 47-48. As such, we find no reversible error regarding the State's argument as to this issue.

¶ 53    Finally, respondent argues that the State disparaged his expert witness, Dr. Abbott, where it commented that he was wearing a "$5,000 suit" at trial and that his presence was a "free advertisement" to defense attorneys. The statements regarding Dr. Abbott's appearance and credibility were preserved on appeal. Additionally, the trial court sustained respondent's objection to the State's comment regarding Dr. Abbott's appearance at trial. See *Bannister*, 232 Ill. 2d at 91.

¶ 54    We note that the comments at issue here were raised in the State's rebuttal. Respondent's closing argument focused on the bias exhibited by the State's expert witnesses, including that Dr. Kuzia was following "a script" in finding that respondent was a sexually violent person. Generally, the State "may respond in rebuttal to statements of defense counsel that noticeably invite a response." *People v. Willis*, 2013 IL App (1st) 110233, ¶ 110. Further, the comments at issue relate to Dr. Abbott allegedly receiving payment for finding that respondent was not a sexually violent person and being biased in favor of respondent. Dr. Abbott acknowledged during cross-examination that he testified primarily on behalf of the defense and received payment for his evaluations. The State's remarks regarding these points "were acceptable comments" regarding Dr. Abbott's possible bias. See *People v. Hickey*, 178 Ill. 2d 256, 291 (1997) (statements during closing argument about the defense expert witness' bias were based on the evidence where the

expert witness worked primarily for defendants and had "increased his income considerably" when he testified in such cases); see also *People v. Guerrero*, 2020 IL App (1st) 172156, ¶ 22.

¶ 55    Even if the statements regarding Dr. Abbott were inappropriate, however, respondent has not established that the comments were "so prejudicial that real justice was denied or the verdict resulted from the error." See *Williams*, 2022 IL 126918, ¶ 41. The State's expert witnesses opined that respondent suffered from OSPD nonconsent and antisocial disorder, which affected his ability to control his sexual behavior. Dr. Abbott disagreed with the experts' conclusion but also testified that he did not believe that OSPD nonconsent was a valid diagnosis. See *In re Commitment of Brown*, 2021 IL App (1st) 191606, ¶ 91 ("Illinois courts have consistently held that OSPD nonconsent is generally accepted within the scientific community."). Each witness, including Dr. Abbott, scored respondent similarly using the actuarial instruments, but disagreed as to the conclusions to be drawn from them. The State's expert witnesses testified regarding other dynamic risk factors, which Dr. Abbott did not find relevant. It was the role of the jury "to determine which expert's opinion was more persuasive." *In re Commitment of Crocker*, 2026 IL App (1st) 242487-U.

¶ 56    Further, as noted, the court instructed the jury not to consider statements in the parties' closing arguments which were not based on the evidence presented at trial. There is no indication that they did so. Even if such comments were erroneous, they were not "of such magnitude that they resulted in substantial prejudice" to the defendant and "constituted a material factor" in being

found to be a sexually violent person. See *In re Commitment of Butler*, 2013 IL App (1st) 113606, ¶ 38.

¶ 57    In sum, no reversible error resulted from the State's closing argument and rebuttal.

¶ 58                    B. The Court's Failure to *Voir Dire* the Jurors

¶ 59    Respondent next argues that the trial court erred in not questioning the jurors regarding whether they were potentially sleeping during testimony. He also contends that the court erred in denying his request to remove the juror who was alleged to have been sleeping during the trial.

¶ 60    "[A] juror who is inattentive for a substantial portion of a trial has been found to be unqualified to serve on a jury." *People v. Jones*, 369 Ill. App. 3d 452, 455 (2006). When the trial court observes possible juror misconduct, it has the discretion to reopen *voir dire*. *Id*. We review the trial court's actions for abuse of discretion. *Id*.

¶ 61    Defendant asserts that the facts of this case are analogous to those in *Jones*, 369 Ill. App. 3d 452. In that case, the trial court noticed that a juror was "half asleep during almost the entire proceeding" but did not take remedial action. *Id*. at 453-54. We found that "[u]nder these circumstances," the trial court must, on its own motion, "make further inquiry to ensure that the defendant receives a fair trial." *Id*. at 456. We held that the trial court abused its discretion for failing to reopen *voir dire* given the juror's inattentiveness during "almost the entire proceeding." *Id*.

¶ 62    The facts in the case at bar are distinguishable. Here, defense counsel alerted the trial court to only two instances where jurors had closed their eyes or appeared to be asleep: during Dr. Gaskell's cross-examination after discussing the predictive value of the actuarial instruments and during Dr. Abbott's direct examination when he testified regarding his credentials. It is unclear what, if any, portion of Doctors Gaskell and Abbott's testimony the jurors missed, but the issues

were raised after relatively insignificant parts of the proceedings. See *People v. Gonzalez*, 388 Ill. App. 3d 566, 577-78 (2008) (considering whether the alleged sleeping juror missed any "significant testimony"). Regardless, in both instances, the court admonished the jurors regarding the importance of paying attention during the trial. There is no evidence that establishes that any more serious remediation was necessary. Accordingly, the trial court did not abuse its discretion in failing to reopen *voir dire* to address the issue. See *Jones*, 369 Ill. App. 3d at 456.

¶ 63                                                    III. CONCLUSION

¶ 64           For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 65           Affirmed.